IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CELLUSTAR CORP.,<br><br>Plaintiff,<br><br>v.<br><br>SPRINT SOLUTIONS, INC. ET AL.,<br><br>Defendants. | CIV. NO.: 19-1559 (SCC) |

**OPINION AND ORDER**

This action was originally brought in Puerto Rico state court by Plaintiff Cellustar Corp. ("Cellustar") against Defendants Sprint Solutions, Inc. and PR Wireless PR, L.L.C. (collectively, "Sprint") alleging violations of the Puerto Rico Dealers' Act, 10 L.P.R.A. §§ 278-278e (also known as "Law 75"), the Sherman Act, 15 U.S.C. §§1 and 2, and the Robinson-Patman Act, 15 U.S.C. § 13(a)-(f), as well as various other state laws. *See* Docket No. 1, Ex. 2. Sprint removed the case to this Court on the basis of both subject matter and diversity jurisdiction. *See* Docket No. 1. Subsequent to a merger under which DISH assumed Sprint's rights and obligations under its contract with Cellustar, DISH requested to join this action pursuant to Federal Rule of Civil Procedure 20(a)(2). *See* Docket Nos. 116, 120.

Pending before the Court are Cellustar's Motions for Preliminary Injunction under Law 75 and the Robinson-Patman Act, *see* Docket Nos. 68, 96, and 149, as well as DISH's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), *see* Docket No. 127, and Sprint's Motion for Judgment on the Pleadings, *see* Docket No. 134.[1]

## I. Factual and Procedural Background

In January of 2011, Sprint entered into a contract with Cellustar under which Cellustar agreed to become a distributor of Sprint's prepaid mobile phone service and product brand, Boost Mobile, in Puerto Rico and the U.S. Virgin Islands. *See* Docket No. 95, ¶¶ 9-10. In order to sell Boost Mobile phones and accompanying services, Cellustar subcontracts with retailers that sell those products and services directly to Boost Mobile customers. *See id.* at ¶ 12. Cellustar is not the exclusive distributor of Boost Mobile products and services; Sprint also has a contract with Actify LLC ("Actify") under which Actify is a Boost Mobile distributor in Puerto Rico and the U.S. Virgin Islands. *See id.* at ¶¶ 13-14. As of July 1, 2020, DISH assumed Sprint's obligations under the contract with Cellustar as part of a merger between Sprint and T-Mobile US. *See id.* at ¶ 62.

---

[1] Cellustar opposed DISH's Motion to Dismiss at Docket Number 131 and Sprint's Motion for Judgment on the Pleadings at Docket Number 139.

Accordingly, DISH requested to join this action under Federal Rule of Civil Procedure 20(a)(2). *See* Docket Nos. 116, 120.

In its Amended Complaint, Cellustar alleges that, in spite of Cellustar's success as a distributor of Boost Mobile products and services, Sprint has carried out "acts of impairment in the existing distributor relationship" with the intention of pushing Cellustar out of the prepaid cellphone market in Puerto Rico in order to "take advantage of the development of the Boost Mobile brand that Cellustar had achieved since 2011." *Id.* at ¶ 16. Cellustar alleges that Sprint furthered this goal by restricting Cellustar's inventory, refusing to allow Cellustar to be master agent of any Open Mobile retailers (the former name of Co-Defendant PR Wireless before it was bought by Sprint in 2017), prohibiting Cellustar's retailers from opening new stores and requesting them to relocate, adding shipping costs or eliminating credit terms while not doing the same to Actify, attempting to cancel or rescind the contract between Sprint and Cellustar, performing promotional activities almost exclusively with Actify, planning with Actify the termination and assignment of Cellustar's business and agreeing on subsidies, benefits and incentives with Actify and not with Cellustar. *See id.* at ¶ 93.

Cellustar alleges that the above actions by Sprint and/or PR Wireless[2] constitute violations of the Puerto Rico Dealers' Act (also known as "Law 75"), the Sherman Act, the Robinson-Patman Act, the Puerto Rico antitrust laws analogous to the federal antitrust provisions and various other state laws. Cellustar seeks preliminary and permanent injunctive relief, as well as damages.

Cellustar has on several occasions requested a preliminary injunction under Law 75 and the Robinson-Patman Act, all of which were opposed by Defendants. *See* Docket Nos. 68, 96 and 140. The Court ruled that it would consolidate the preliminary injunction hearing with a hearing for permanent injunctive relief pursuant to Federal Rule of Civil Procedure 65(a)(2), which will be held once possible in light of COVID-19 constraints. DISH moved to dismiss Cellustar's claims against it under the Sherman Act and the Robinson-Patman Act, as well as the analogous Puerto Rico antitrust laws pursuant to Federal Rule of Civil Procedure 12(b)(6), while Sprint and PR Wireless moved for judgment on the pleadings as to all claims against them under Federal Rule of Civil Procedure 12(c).

---

[2] In the Amended Complaint, Cellustar refers to both Sprint and PR Wireless simply as "Sprint," making it impossible to distinguish which allegations are made against Sprint, which are made against PR Wireless and which are made against both.

## II.   Standards of Review

### A. *Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)*

In order to survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure (12)(b)(6), a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In deciding whether this standard has been met such that the plaintiff has raised "a right to relief above the speculative level," *id.* at 555, a court accepts as true all well-pleaded facts and draws all reasonable inferences in the plaintiff's favor. *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008). However, the court must also "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz c. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). While a complaint need not give detailed factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

### B. *Motion for Judgment on the Pleadings*

Sprint moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* Docket No. 134. That rule permits a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed,"

provided the motion does not delay the trial. Fed. R. Civ. P. 12(c). While a motion to dismiss under Rule 12(b)(6) and a motion for judgment on the pleadings under Rule 12(c) are generally accorded the same treatment, a Rule 12(c) motion implicates the pleadings as a whole, rather than the complaint alone. *Aponte-Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 54-55 (1st Cir. 2006). Because a Rule 12(c) motion, like a Rule 12(b)(6) motion, requires some assessment of the merits of the case at its nascence, "the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom to the nonmovant's behoof." *R.G. Fin. Corp. v. Vergara-Nuñez*, 446 F.3d 178, 182 (1st Cir. 2006) (citing *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988)).

### III. Analysis

#### A. *Sherman Act Claims*[3]

##### 1. Section 1

Cellustar alleges that Sprint conspired with Actify to unreasonably restrict trade in violation of § 1 of the Sherman. That section makes illegal any "contract, combination . . . or conspiracy, in restraint of trade of trade or commerce . . . ." 15 U.S.C. § 1. Generally, § 1 claims are examined through the

---

[3] Though not apparent in the Amended Complaint, Cellustar clarified in its Opposition to DISH's Motion to Dismiss that its claims under the Sherman Act are raised only against Sprint, not against DISH. *See* Docket No. 131, pg. 3.

"rule of reason" analysis, "under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Yet there exists a very narrow category of *per se* violations, *i.e.*, "challenged conduct [that] falls within a small set of acts regarded by courts as sufficiently dangerous, and so clearly without redeeming value, that they are condemned out of hand – that is without a showing of wrongful purpose, power or effect." *Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 4 (1st Cir. 2004); *see also Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004).

Cellustar seemingly alleges that Sprint and Actify conspired to fix prices and limit product output, constituting a *per se* violation of § 1. *See* Docket No. 139, pg. 7. However, the type of prohibited price-fixing or output restriction contemplated by the Sherman Act occurs as a result of horizontal agreements between competitors as to competing products or services.[4] *See id* ("Almost the only important categories of agreements that reliably deserve this label today are those *among competitors* that amount to 'naked' price fixing, output restriction, or division of customers or

---

[4] The only other type of price-fixing that is condemned *per se* is vertical minimum resale price-fixing, a narrow exception not alleged here. *See Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 47 (1st Cir. 2001).

territories." (emphasis added)); *Augusta News*, 269 F.3d at 47 (citing *Broadcast Music, Inc. v. Columbia Broadcasting Sus. Inc.*, 441 U.S. 1 (1979). Sprint and Actify are not competitors that produce competing products or services; they are two businesses in a vertical relationship working at two different levels of the market – one a seller and one a distributor of the goods and services sold by the other. Therefore, the alleged conduct by Sprint cannot fall into the *per se* category and must be evaluated under the rule of reason. *See Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58-59 (1977) (noting that vertical restrictions are presumptively governed by the rule of reason).

However, as a threshold matter, § 1 by its plain terms reaches only "agreements" – whether tacit or express, and not simply independent decisions. *Twombly*, 550 U.S. at 553. Accordingly, the Supreme Court has held that a claim under § 1 "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. An agreement may be found when "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (explaining that, in alleging conspiracy, an antitrust plaintiff may present either direct or circumstantial evidence of defendants' "conscious commitment to a common scheme

designed to achieve an unlawful objective"). *Twombly* makes clear that, to survive a Rule 12(b)(6) motion, "a complaint must at least allege the general contours of when an agreement was made, supporting those allegations with a context that tends to make said agreement plausible." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 46 (1st Cir. 2013).

The only "agreement" to which Cellustar points is a contract to do business between Sprint and Actify that was allegedly more advantageous that the contract between Sprint and Cellustar. This hardly amounts to a "meeting of the minds" with the end goal of achieving an unlawful objective, but rather indicates an independent business decision by Cellustar to contract with its distributors in a way it sees fit. *See Twombly*, 550 U.S. at 557 (explaining that without any indication of a meeting of the minds, an "account of defendant's commercial efforts" does not amount to an agreement under § 1). Cellustar provides no facts to reasonably suggest that Sprint and Actify in any way conspired to damage Cellustar's position in the prepaid mobile phone market in Puerto Rico or achieve any other anticompetitive end goal. Thus, even viewing the Amended Complaint in the light most favorable to Cellustar, its failure to plead any facts that plausibly suggest that an illegal agreement existed is fatal to its § 1 claim under Rule 12(b)(6) (and, by extension, under Rule 12(c)).

2. Section 2

Section 2 of the Sherman Act prohibits efforts to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States . . . . 15 U.S.C. § 2. Monopolization claims require a plaintiff to establish that the defendant (1) has monopoly power and (2) "has engaged in impermissible 'exclusionary' practices with the design or effect of protecting or enhancing its monopoly position." *Coastal Fuels of P.R., Inc. v. Caribbean Petrol. Corp.*, 79 F.3d 182, 195 (1st Cir. 1996). Attempted monopolization occurs when a person (1) "has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993); *see also Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 119 (1st Cir. 2011). In order to establish these elements, it is necessary for a plaintiff to define the relevant market and "the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456.

Defendants first argue that Cellustar has failed to define the relevant market, a threshold requirement of a § 2 claim. *See Coastal Fuels*, 79 F.3d at 196. The relevant market is comprised of two elements: a product market and a geographic market. *Spectrum Sports*, 506 U.S. at 459; *Coastal Fuels*, 79 F.3d at 197. DISH argues that "Cellustar cannot

ignore the commercial realities of the cellular phone industry and fashion a narrow product market based solely upon a 'single-brand' (e.g., 'Boost Mobile phones') . . . ." Docket No. 127, pg. 14. However, Cellustar's definition of the relevant market is not so narrow as Defendants suggest; it clarified that "there is no room for doubt that the product market is the prepaid mobile phone market in Puerto Rico." Docket No. 139, pg. 9. Moreover, many of the cases that Defendants rely on are either cases at the summary judgment stage or from other jurisdictions, and we do not find them persuasive. At this early stage, with only the initial pleadings before us, we find that Cellustar's definition of the relevant market is sufficient for purposes of alleging a § 2 claim. *See Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 55 (1st Cir. 2003) ("There is no mechanical rule [for defining the relevant market] . . . and while there are arguments for a larger market, the matter cannot be resolved on the face of the complaint."); Fed. R. Civ. P. 12(b)(6).

While Cellustar has adequately defined the relevant market for purposes of surviving a 12(b)(6) motion, its § 2 claims fall short of sufficiently alleging that Sprint had any market power within that market. *See Sterling*, 656 F.3d at 125 (explaining that, to prevail on a monopolization claim, a plaintiff must first show that the defendant has monopoly power in the relevant market). The Amended Complaint is devoid of any facts indicating that Sprint had any significant

share of the prepaid mobile phone market in Puerto Rico, much less that it had the "ability to less or destroy competition" in that market. *Coastal Fuels*, 79 F.3d at 196. Cellustar has thus neither alleged that Sprint had monopoly power nor that it had "a dangerous probability of achieving monopoly power." *Spectrum Sports*, 506 U.S. at 456. While Cellustar is not required to provide in-depth data of Sprint's market share in order to survive a motion under Rule 12(b)(6), Cellustar gives no indication as to how much of the relevant market Sprint occupied such that it has "a claim to relief [under § 2] that is plausible on its face." *Twombly*, 550 U.S. at 570. Consequently, Cellustar's claims under § 2 of the Sherman Act are dismissed.

### 3. Puerto Rico Antitrust Law Claims

Cellustar also asserts claims under certain provisions of Puerto Rico's antitrust law, 10 L.P.R.A. §§ 258 and 260, that parallel its claims under the Sherman Act. Because the First Circuit has held that the relevant two provisions under this Puerto Rico analogue are coextensive with §§ 1 and 2 of the Sherman Act, claims under the state law provisions and those under the federal law provisions are to be analyzed in the same manner. *See Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.*, 322 F.3d 6, 16 (1st Cir. 2003) (as to § 258 of the Puerto Rico antitrust law and § 1 of the Sherman Act); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d

182, 196 (1st Cir. 1996) (as to § 260 of the Puerto Rico antitrust law and § 2 of the Sherman Act). Accordingly, for the same reasons iterated *supra*, we find that Cellustar's claims under §§ 258 and 260 of the Puerto Rico antitrust law also fail under Rule 12(b)(6) and Rule 12(c).

### IV. Conclusion

Having carefully examined the arguments by all parties, the Court's disposition is the following:

1. DISH's Motion to Dismiss at Docket Number 127 is GRANTED as to all claims under the Sherman Act and the analogous Puerto Rico antitrust law provisions, to the extent that Cellustar alleges such claims against DISH, and DENIED as to all remaining claims;

2. Sprint's Motion for Judgment on the Pleadings at Docket Number 134 is GRANTED as to all claims under the Sherman Act and the analogous Puerto Rico antitrust law provisions, and s DENIED as to all remaining claims;

3. Because this Court has already held that it will consolidate the preliminary injunction hearing with a hearing for permanent injunctive relief pursuant to Federal Rule of Civil Procedure 65(a)(2), Cellustar's Motions for Preliminary Injunctive Relief at Docket Numbers 68, 96 and 149 are DENIED. *See* Docket No. 119.

4. The surviving claims under Law 75 and the Robinson-Patman Act will be considered by the Court on the merits at the permanent injunction hearing, which will be scheduled at a later date in light of the logistical complications due to COVID-19 and pursuant to the CARES Act and the January 26, 2021 Standing Order issued by Chief Judge Gelpí.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 18th day of February 2021.

                <u>S/ SILVIA CARREÑO-COLL</u>
                UNITED STATES DISTRICT COURT JUDGE