**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| CELLUSTAR CORP., <br><br> Plaintiff, <br><br> v. <br><br> SPRINT SOLUTIONS INC., et al. <br><br> Defendants. | **Civil No. 19-1559 (GMM)** |

<u>**OPINION AND ORDER**</u>

Pending before the Court are the parties' cross-motions for summary judgment: Defendants Sprint Solutions, Inc.'s ("Sprint") and PR Wireless PR, LLC's ("PR Wireless") (collectively, "Defendants"[1]) *Defendants Sprint Solutions, Inc. and PR Wireless PR, LLC's Motion for Summary Judgment* ("*Defendants' Motion to Summary Judgment*"), (Docket No. 305), and Plaintiff Cellustar Corp.'s ("Cellustar" and "Plaintiff") *Motion for Partial Summary Judgment Pursuant to the Puerto Rico Dealer's Act and Robinson-Patman Act, 15 U.S.C. § 13(A)-(F)* ("*Plaintiff's Motion for Partial Summary Judgment*"), (Docket No. 307). For the foregoing reasons, *Defendants' Motion for Summary Judgment* is **GRANTED IN PART** as to

---

[1] DISH Network Corp. ("DISH") was initially a Defendant in this civil action, yet all claims were dismissed with prejudice against DISH, pursuant to the terms and conditions of a confidential settlement agreement. (Docket Nos. 169, 172). Accordingly, this *Opinion and Order* does not delve into the claims that pertain to DISH.

Civil No. 19-1559 (GMM)
Page -2-

the claims brought under the Robinson-Patman Act and the Puerto Rico Anti-Monopoly Act and *Plaintiff's Motion for Partial Summary Judgment* is **DENIED IN PART** under those statutes.

## I.    BACKGROUND

Cellustar alleges that in January 2011 it entered into a dealership agreement with Sprint to distribute Boost Mobile prepaid cellular phones in Puerto Rico and the U.S. Virgin Islands. (Docket No. 95 at 3-5 ¶¶ 9-14, 22). Between 2015 and 2020, Sprint allegedly undertook "acts of impairment" to force Cellustar out of the prepaid cellphone market and capitalize on the Boost Mobile market that Cellustar had developed to benefit Cellustar's competitor. (Id. at 5 ¶ 16; 13 ¶ 65). Specifically, Sprint purportedly terminated Cellustar's dealership; restricted its inventory access; limited Cellustar's services and expansion; imposed unsubstantiated shipping cost; concentrated promotional efforts on Cellustar's competitor; and granted Cellustar's competitor subsidies and incentives unavailable to Cellustar. (Id. at 5-9 ¶¶ 23-27, 33, 35, 41, 45, 47, 52-58; 13 ¶ 64; 21 ¶ 93).

On July 14, 2020, Cellustar filed its *Amended Complaint* alleging violations of multiple federal and state laws. (Docket No. 95). Defendants answered and counterclaimed, asserting it complied with all contractual obligations. (Docket No. 128 at 29 ¶¶ 1-2). Defendants denied Cellustar's allegations, contending

Civil No. 19-1559 (GMM)
Page -3-

that inventory allocation followed a sales-based formula; compensation and shipping changes resulted from a nationwide model; certain benefits were withheld due to ongoing litigation; and COVID-19 restrictions, rather than favoritism, limited Cellustar's operations. (Id. at 7 ¶ 29; 12 ¶ 45; 16 ¶¶ 60-61). Cellustar reiterated its position, (Docket No. 130), and Defendants moved for judgment on the pleadings. (Docket No. 134).

On February 18, 2021, U.S. District Judge Silvia Carreño-Coll granted in part judgment on the pleadings, dismissing federal and state antitrust claims, and denied in part as to the remaining claims. (Docket No. 158). The surviving claims are: termination, impairment, injunctive relief, and attorney's fees under the Puerto Rico Dealers Act, P.R. Laws Ann. tit. 10, §§ 278a, 278b, 278b-1, 278-e (also known as "Law 75"); price discrimination under the Puerto Rico Anti-Monopoly Act, P.R. Laws Ann. tit. 10, §§ 263-64, and the Robinson-Patman Act, 15 U.S.C. §§ 13(a), (c)-(e); and negligence under the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31, § 5141.[2]

Following discovery, Defendants moved for summary judgment on April 30, 2025, (Docket No. 305), and Cellustar filed a cross-

---

[2] Although Article 1802 of the Puerto Rico Civil Code of 1930, P.R. Laws Ann. tit. 31, § 5141, has been replaced by Article 1536 of the Puerto Rico Civil Code of 2020, P.R. Laws Ann. tit. 31, § 10801, the facts that give rise to the causes of action occurred prior to the adoption and implementation of the Civil Code of 2020. Hence, the provisions of the Civil Code of 1930 are operative. P.R. Laws Ann. tit. 31, §§ 11717-18.

Civil No. 19-1559 (GMM)
Page -4-

motion for partial summary judgment the same day. (Docket No. 307). The parties have filed oppositions, replies, and surreplies, along with hundreds of uncontested facts and their corresponding exhibits. (Docket Nos. 320, 322, 334, 336).

The Court has meticulously evaluated all of the parties' filings. The matter is fully briefed and ripe for adjudication.

## II.  LEGAL STANDARD

A.    Fed. R. Civ. P. 56

Summary judgment is granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992).

"A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party" and, by the same token, "[a] fact is material if it has the potential of determining the outcome of the litigation." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)). The movant bears the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

Civil No. 19-1559 (GMM)
Page -5-

The Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan, 904 F.2d at 115. Questions of credibility and fact-finding are reserved for a jury. Greenburg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). The Court may, however, safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

Cross-motions for summary judgment do not change the standard, but narrow it to judgment as a matter of law on uncontested facts. Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ships, S.E., 615 F.3d 45, 51 (1st Cir. 2010). Each motion is considered on its own merits and held to the same standard. Id.

B.    Loc. Civ. R. 56

Motions for summary judgment are also governed by Local Civil Rule 56. Loc. Civ. R. 56; see also López-Hernández v. Terumo P.R. LLC, 64 F.4th 22, 26 (1st Cir. 2023). At its discretion, the Court can accept a movant's facts where they are not properly controverted. Id.; see also Ramírez-Rivera v. DeJoy, 693 F. Supp. 3d 210, 213 (D.P.R. 2023).

Civil No. 19-1559 (GMM)
Page -6-

### III. UNCONTESTED FACTS

The Court examined Plaintiff's *Statement of Uncontested Facts* (Docket No. 307-1); Defendants' *Statement of Uncontested Material Facts in Support of Defendants' Motion for Summary Judgment* (Docket No. 305-1); opposition briefs to each other's statement of uncontested facts (Docket Nos. 320-1, 322-1); and replies to each other's opposition briefs, (Docket Nos. 334-2, 336-1).

After thorough review, the Court finds that the following material facts are not in genuine dispute:

A.    Relevant parties and their relationship

1.    Cellustar is a corporation organized under the laws of Puerto Rico. (Docket Nos. 307-2 at 1 ¶ 1; 320-1 at 1 ¶ 1).

2.    Sprint is a wholly owned subsidiary of Sprint Communications, Inc., which, in turn, is a wholly owned subsidiary of Sprint Corporation. On December 31, 2021, Sprint Corporation converted into a limited liability company and is currently doing business as Sprint LLC, which is a wholly owned subsidiary of T-Mobile USA, Inc. Sprint is organized under the laws of Delaware and authorized to do business in Puerto Rico. (Docket Nos. 128 at 1-3 ¶¶ 2, 7; 232 at 1; 307-2 at 1 ¶ 3; 336-1 at 2 ¶ 4).

3.    PR Wireless is a limited liability company organized in the state of Delaware and authorized to do business in Puerto Rico. PR Wireless is currently a wholly owned subsidiary of T-Mobile USA, Inc. (Docket Nos. 232 at 1-2; 307-2 at 1 ¶ 4; 307-7 at 12-13; 336-1 at 2 ¶ 4).

Civil No. 19-1559 (GMM)
Page -7-

4.  Prior to November 2017, PR Wireless operated under Open Mobile as a prepaid cellular phone brand. (Docket Nos. 305-30 at 7; 336-1 at 2 ¶¶ 4, 6).

5.  In 2010, Sprint introduced the Boost Mobile brand in Puerto Rico, after acquiring its competitor Virgin Mobile. (Docket Nos. 128 at 3 ¶ 8; 307-2 at 2 ¶ 8; 320-1 at 3 ¶ 8).

6.  Boost Mobile is brand of prepaid cellular phones that offer wireless telephone services. (Docket Nos. 305-3 at 4; 307-2 at 1-2 ¶¶ 6-7; 322-1 at 1 ¶ 1).

7.  In November 2017, PR Wireless and Sprint began a joint venture under the Boost Mobile brand. (Docket Nos. 305-30 at 4-6; 322-1 at 20 ¶ 72).

8.  As part of the joint venture, PR Wireless and Sprint would provide prepaid wireless telecommunications services in Puerto Rico and the U.S. Virgin Islands, under the Boost Mobile brand. Boost Mobile operated through PR Wireless and used the telecommunications networks and accounts of Sprint. Since its formation, Sprint was the majority owner of Boost Mobile. Effective as of November 21, 2019 and up to July 1, 2020, Sprint became the sole owner of Boost Mobile. (Docket Nos. 305-4 at 6-8; 307-7 at 12-13; 336-1 at 2 ¶¶ 4, 6; 336-1 at 2 ¶ 4).

9.  As part of this joint venture, Open Mobile ceased to exist, and Open Mobile retail stores were converted to Boost Mobile retail stores. (Docket Nos. 305-30 at 4-6; 322-1 at 20 ¶ 73).

10.  Under Boost Mobile's business model, Sprint would purchase cellular phones from manufacturers, including Apple and Samsung. Sprint would then sell these phones to Master Agents which, in turn, sold them to Boost Mobile retailers, who would sell the phones to customers. (Docket Nos. 128 at 3-4 ¶ 12; 322-1 at 2 ¶ 3).

Civil No. 19-1559 (GMM)
Page -8-

11.  In 2010, VIP Wireless and Actify LLC ("Actify") were the Master Agents of Boost Mobile in Puerto Rico. Eventually, VIP Wireless withdrew from the market, leaving Actify as the only Master Agent in Puerto Rico. (Docket Nos. 305-7 at 5 ¶ 12; 307-2 at 2 ¶¶ 8-9; 320-1 at 2-3 ¶¶ 6-9).

12.  Actify operated at the national level, conducting business within twelve to fifteen States at various times, including Puerto Rico. (Docket Nos. 305-6 at 37-38; 322-1 at 2 ¶ 5).

13.  In January 2011, Cellustar and Sprint entered into a *Prepaid Wireless Product Agreement* ("2011 Agreement") in which Cellustar became the Master Agent for the sale of Boost Mobile products within Puerto Rico and the U.S. Virgin Islands. The effective term was August 1, 2010 to April 1, 2012, with an automatic month-to-month renewal thereafter. (Docket Nos. 95 at 3 ¶¶ 9-10; 128 at 4 ¶ 13; 307-2 at 2 ¶ 11; 320-3 at 2; 322-1 at 2 ¶ 6; 336-1 at 3-4).

14.  In 2013, Cellustar and Sprint entered into another *Prepaid Wireless Product Agreement* ("2013 Agreement"). The effective term was August 1, 2013 to August 1, 2014. (Docket Nos. 305-7 at 4 ¶ 1; 305-9 at 2; 322-1 at 2 ¶¶ 9-10).

15.  The 2013 Agreement contained a merger provision, stating:

> This Agreement, including its exhibits, constitutes the final and full understanding between the parties and supersedes all previous agreements, understandings, negotiations and promises, whether written or oral, between the parties with respect to its subject matter. This Agreement is intended to supersede all previous

Civil No. 19-1559 (GMM)
Page -9-

agreements on the same subject matter that Master Agent previously signed with Supplier. No amendments to this Agreement will be binding on either party unless executed by both parties in writing. In the event of a conflict between this Agreement and any other document, including but not limited to purchase orders (including those executed by either or both parties), this Agreement shall control.

(Docket Nos. 305-9 at 28 ¶ 36; 322-1 at 3 ¶ 11).

16.   In 2014, Cellustar and Sprint entered into another *Prepaid Wireless Product Agreement* ("2014 Agreement"). The effective term of the 2014 Agreement was March 1, 2014 to August 1, 2014. (Docket Nos. 305-7 at 4 ¶ 2; 305-10 at 2; 322-1 at 3 ¶¶ 12-13).

17.   The 2014 Agreement contained the same merger provision as the 2013 Agreement. (Docket Nos. 305-10 at 28 ¶ 36; 322-1 at 3 ¶ 14).

18.   The 2014 Agreement was amended seven times. (Docket Nos. 305-7 at 3-4 ¶¶ 3-9; 305-11 to 305-17; 322-1 at 3 ¶ 15).

19.   In 2017, Cellustar and Sprint entered into another *Prepaid Wireless Product Agreement* ("2017 Agreement"). The effective term was May 1, 2017 to August 1, 2017. (Docket Nos. 305-7 at 5; 305-18 at 2; 322-1 at 3-4 ¶¶ 16-17).

20.   The 2017 Agreement contained the same merger provision as previous agreements. (Docket Nos. 305-18 at 32 ¶ 36; 322-1 at 4 ¶ 18).

21.   The 2017 Agreement was amended to extend its effective term until March 1, 2018. (Docket Nos. 305-7 at 5 ¶ 11; 305-19; 322-1 at 4 ¶ 19).

Civil No. 19-1559 (GMM)
Page -10-

22. Between January 2011 and July 2020, Actify and Cellustar were, simultaneously, the only authorized Master Agents in Puerto Rico for the Boost Mobile brand. (Docket Nos. 305-7 at 5 ¶ 13; 307-2 at 2-3 ¶¶ 11, 14-15; 320-3 at 2; 322-1 at 2 ¶ 8).

B.    Exclusivity of Master Agents

23. The 2011 Agreement did not make Cellustar an exclusive Master Agent. (Docket Nos. 336-1 at 3-4 ¶ 11; 322-1 at 8 ¶ 40, 17 ¶ 67; 336-1 at 84 ¶ 8).

24. The 2011 Agreement provided a non-exclusive relationship provision that stated:

> Master Agent's relationship with Supplier hereunder is not on an exclusive basis, including all product lines and brands offered by Supplier. Supplier may enter into other relationships, may permit other Master Agents and retailers to sell its products and services, may distribute via the Internet, and may utilize its own stores and sales forces (and those of their affiliates) to sell the Products in the same geographic areas, and by the same and/or different methods than Master Agent and/or its Retailers.

(Docket Nos. 320-3 at 22 ¶ 32; 322-1 at 17 ¶ 67).

25. The 2013, 2014, and 2017 Agreements contained the same non-exclusive relationship provision. (Docket Nos. 305-9 at 28 ¶ 34; 305-10 at 28 ¶ 34; 305-18 at 31-32 ¶ 34; 322-1 at 8 ¶ 40).

26. Between January 2011 and July 2020, Cellustar and Actify would compete for retailers of Boost Mobile products in Puerto Rico. (Docket Nos. 307-2 at 3 ¶¶ 11, 14-15; 320-1 at 5 ¶ 15).

Civil No. 19-1559 (GMM)
Page -11-

27.  Between 2011 and 2018, Cellustar was the largest distributor of Boost Mobile products in Puerto Rico. (Docket Nos. 307-2 at 3 ¶ 20; 320-1 at 7 ¶ 19).

28.  By December 2015, Cellustar was Master Agent to 52 Boost Mobile retail stores and 75% of market sales in Puerto Rico, while Actify was Master Agent to 25 Boost Mobile retail stores and 25% of market sales in Puerto Rico. Cellustar was Master Agent to 4 Boost Mobile retail stores and 61% of market sales in the Virgin Islands, while Actify was Master Agent to 1 Boost Mobile retail store and 39% of market sales in the Virgin Islands. (Docket Nos. 307-3 at 3-5; 320-1 at 7 ¶ 20).

29.  In November 2017, as part of the joint venture between Sprint and PR Wireless, Open Mobile retail stores were converted to Boost Mobile retail stores. Actify became the Master Agent for all of these stores, except for one retail store that worked with Cellustar as its Master Agent. (Docket Nos. 305-30 at 5, 9-13; 305-32 at 8-9; 322-1 at 20 ¶¶ 71-73, 21 ¶¶ 75-76).

30.  By December 2017, Cellustar was Sprint's largest Master Agent in Puerto Rico, in terms of retail stores, subscribers, and gross additions of new customers. Cellustar was Master Agent to sixty-seven (67) Boost Mobile retail stores in Puerto Rico, while Actify was Master Agent to twenty-nine (29) Boost Mobile retail stores. (Docket Nos. 307-4 at 28-29 ¶¶ 52-53; 307-5 to 6; 320-1 at 8 ¶ 22).

31.  The 2013, 2014, and 2017 Agreements establish the following for when a distributor or retailer intended to switch its Master Agent: "Authorized Locations that are exclusive to a Master Agent may pursue entering into an exclusive relationship with a new master agent under the Select Retailer Changing Master Agent Process and the Authorized Retailer Master Agent Change Process." (Docket Nos.

Civil No. 19-1559 (GMM)
Page -12-

305-9 at 22-23 ¶ 19; 305-10 at 22-23 ¶ 19; 305-18 at 24 ¶ 19; 322-1 at 18 ¶ 69).

C.    Shipping costs

32.    The 2011 Agreement states that "[a]ny delivery charges are payable by Master Agent when payment of the Price is due for Products." (Docket No. 320-3 at 16 ¶ 8).

33.    The 2013, 2014, and 2017 Agreements stated that "Sprint will invoice Master Agent for all transportation charges including but not limited to the following: (i) Transportation expense; shipping fees." (Docket Nos. 305-7 at 16-17 ¶¶ 55-57; 305-9 at 17 ¶ 8(a)(1); 305-10 at 17 ¶ 8(a)(1); 305-18 at 17-18 ¶ 8(a)(1); 322-1 at 4-5 ¶¶ 20-23).

34.    Ingram Micro Mobility ("Ingram") is a logistics company that received cellular phones from manufacturers and distributed them to Master Agents on Sprint's behalf. (Docket Nos. 305-5 at 5-6; 322-1 at 5 ¶ 24).

35.    Sprint would order and receive cellular phones from manufacturers. Sprint would store the phones at Ingram's facilities in Plainfield, Indiana. Sprint would sell the phones to Master Agents. Master Agents would receive the phones by way of Ingram's services. (Docket Nos. 307-2 at 4 ¶¶ 24-26; 307-7 at 15-17; 307-8 at 3-7; 307-9 at 4-8; 320-4 at 14; 320-1 at 8-9 ¶¶ 25-26).

36.    Actify is a wholly owned subsidiary of Ingram. (Docket Nos. 305-6 at 8; 322-1 at 7 ¶ 33).

37.    When Actify would buy cellular phones from Sprint, Ingram would transport them from Sprint's warehouse to Actify's warehouse – both of which formed part of Ingram's facilities in Plainfield, Indiana. (Docket Nos. 305-6 at 10-11, 30-31, 39-45; 305-20 at 9-11; 307-2 at 4 ¶ 27; 307-9 at 4-8, 18-23; 322-1 at 7 ¶¶ 34-36)

Civil No. 19-1559 (GMM)
Page -13-

38.  Although Actify would pay a logistics fee to Ingram for the transfer, neither Ingram nor Sprint charged Actify a shipping fee. (Docket Nos. 307-2 at 4 ¶ 27; 320-1 at 10 ¶ 322-1 at 7 ¶ 37; 336-1 at 10 ¶ 29).

39.  Actify would ship cellular phones from its warehouse in Plainfield, Indiana to Puerto Rico through the services of DHL and FedEx. (Docket Nos. 307-9 at 21-22; 336-1 at 10 ¶ 29).

40.  When Cellustar bought cellular phones from Sprint, it would purchase the product via Ingram, and Ingram would coordinate the shipping of the products from Ingram's facility in Plainfield, Indiana to Puerto Rico. (Docket Nos. 307-2 at 4 ¶ 28; 320-1 at 10 ¶ 30).

41.  Prior to 2014, Cellustar was never charged a discrete or separate shipping fee for the service of shipping cellular phones from Plainfield, Indiana to Puerto Rico and the U.S. Virgin Islands. (Docket Nos. 305-5 at 20-25; 305-21 at 2-4; 307-2 at 4 ¶ 29; 334-2 at 8 ¶ 25).

42.  On January 7, 2014, Sprint began charging Cellustar a discrete shipping fee for the cellular phones purchased through Ingram, that was separate from the phones' unit cost. (Docket Nos. 305-7 at 18 ¶ 64; 305-21 at 2-4; 305-22 at 4; 307-2 at 4 ¶ 31; 307-11 at 4-12; 322-1 at 5 ¶ 27).

43.  On February 12, 2014, Cellustar emailed Marlene Martell ("Martell"), Sprint's Indirect Sales Manager, that since January 7, 2014, Cellustar had paid $3,146.29 in shipping fees for a total of 1,288 phones, at an average shipping cost of $2.44 per phone. Cellustar informed that, due to the charge of a discrete or separate shipping fee, Cellustar's revenue

Civil No. 19-1559 (GMM)
Page -14-

was reduced from $4.00 to $1.56 per phone. Cellustar included in the e-mail:

> Also, we asked some dealers of other MA in Puerto Rico [i.e., Actify] about be[ing] charge[d] for shipping, and their answer is that they are not paying for shipping in their orders of five (5) phones or more. We can't understand why these dealers are not paying shipping charges and Cellustar that is a Master Agent has to pay for the shipping.

(Docket Nos. 307-11 at 1-2; 336-1 at 11 ¶ 34).

44. On February 12, 2014, Martell responded:

> Ok, so I received notification that beginning January 13, 2014, Ingram will begin charging the dealers in PR/VI freight for shipments (this is for both prepaid and postpaid). This is a company policy implemented by Sprint. So, Cellustar (as the Master Agent) can implement its own policy as to whether the dealer pays for shipping costs on the handsets OR Cellustar pays for this.

(Docket Nos. 307-11 at 1-2; 336-1 at 12 ¶ 36).

45. On February 13, 2014, Martell emailed Matthew DeMaria ("DeMaria"), Sprint's Channel Inventory Programs and Strategy Manager, to ask: "Is there anything in IMM [Ingram] where it details the shipping costs to PR/VI? Anything that I can share with Cellustar?" (Docket Nos. 307-12 at 3; 336-1 at 12 ¶ 37).

46. On February 13, 2014, DeMaria replied to Martell:

> There is no policy, per se. When something is shipped, generally there are shipping charges associated with it. Dealers in PRVI have been positively affected by IMM's [Ingram's] systems

Civil No. 19-1559 (GMM)
Page -15-

> limitations when shipping to PRVI up until now. The contract, in section 7, titled DELIVERY, does quickly mention, "*Any delivery charges are payable by Master Agent when payment of the Price is due for Products.*"

(Docket Nos. 307-12 at 2; 336-1 at 12 ¶ 37).

47. On February 18, 2014, Martell emailed Jerry Bland ("Bland"), Sprint's Regional Director, Sales & Distribution for Sprint Prepaid Group, indicating:

> As per our conversation, Cellustar is looking for us to provide written documentation of the shipping cost changes. It seems that this was not something that was put in writing. Were you able to speak to someone regarding crediting Cellustar for shipping charges at least for the first 60 days? Cellustar keeps requesting written documentation on the changes. Just worried of any legal ramifications for not providing documentation? Thoughts?

(Docket Nos. 307-12 at 2; 336-1 at 12 ¶ 38).

48. On February 18, 2014, Bland emailed Blair Frock ("Frock"), Sprint's Senior Director of Wireless Sales Operations, indicating:

> Our local Master Agent is Puerto Rico started getting invoiced for some new incremental shipping charges that started (I think starting in Jan) without notice from us so this caught my team and the Local, MA flat footed. I believe this happened across post-paid as well as from Spangler's group that I think is Ingram driven (not sure). Is it possible to get something more official in writing to the Master and would it be reasonable to assume we should credit them for any changes incurred prior to giving them

Civil No. 19-1559 (GMM)
Page -16-

> notice? Not a lot of money (approx. 2k-3k). I'm sure we can get more exact #'s.

(Docket Nos. 307-12 at 1-2; 336-1 at 12-13 ¶ 39).

49.  On February 18, 2014, Frock responded to Bland and carbon-copied DeMaria: "Yes, caught us off guard to[o]. It's in our contract w/ them that we will charge freight but hadn't been doing it." (Docket Nos. 307-12 at 1; 336-1 at 13 ¶ 40).

50.  On February 18, 2014, Bland emailed Martell, stating:

> What you can tell them [Cellustar] is: It's in our contract w/ them that we will charge freight but hadn't been doing it (which has been savings for them), and a decision throughout Sprint was made to do so and the prepaid team was invertedly missed in the internal communications which apologize about how they were informed.

(Docket Nos. 307-12 at 1; 336-1 at 13 ¶ 41).

51.  On February 18, 2014, Martell responded to Bland: "No credit being issued here, then? If we are able to give a credit, then we can use that to our advantage with saying, we are communicating this now and for this reason we are crediting your account (or something to that effect)?" (Docket No. 307-12 at 1).

52.  On February 19, 2014, Cellustar wrote to Ingram:

> Earlier this month I received the answer about the shipping cost changes to PR since January 2014. Now, if Cellustar have to [sic] pay the shipping, also we could consider other company besides FedEx to ship the orders we make. I want to know if we can choose another company,

Civil No. 19-1559 (GMM)
Page -17-

> what other options in companies we have (except FedEx) that can complete the shipping process and how much it will cost (I know the cost will depend on the company we choose, but if you have that information I will appreciate you send me the information along with the answer).

(Docket Nos. 307-14 at 2; 336-1 at 14 ¶ 42).

53. On February 19, 2014, Ingram responded to Cellustar: "I am sorry but all Sprint product is shipped by FedEx." (Docket Nos. 307-14 at 1-2; 336-1 at 14 ¶ 43).

54. On February 21, 2014, Martell emailed Cellustar:

> In reference to the shipping costs and communication about the shipping costs: It's in our contract with the Master Agent that we will charge freight, but hadn't been doing it (which has been savings for Cellustar), and a decision throughout Sprint was made to do so. The prepaid team was inadvertently missed in the internal communications. We apologize about how Cellustar was informed.

(Docket Nos. 307-13 at 1; 336-1 at 14 ¶ 41).

55. Cellustar learned that neither Sprint nor Ingram charge a shipping fee to Actify several months after Cellustar began to pay such fees in February 2014. (Docket Nos. 95 at 5 ¶ 21; 307-2 at 6 ¶ 37; 307-15; 322-1 at 7 ¶ 37).

56. In November 2015, Fivestar - Cellustar's largest dealer of Boost Mobile products – changed its Master Agent from Cellustar to Actify. (Docket Nos. 305-8 at 15-16; 307-2 at 6 ¶ 39; 315-3 at 2-4; 322-1 at 8 ¶ 39; 336-1 at 15-16 ¶ 46).

Civil No. 19-1559 (GMM)
Page -18-

57. On November 24, 2015, Patricia Eaves ("Eaves") – Sprint's General Manager in Puerto Rico until 2017 and, thereafter, the Chief Commercial Officer for PR Wireless – emailed Bland: "When you have a time please give me a call I want to understand Adolfo's [Cellustar's] issue with shipping cost vs the other master [Actify]." (Docket Nos. 307-18 at 3; 336-1 at 17 ¶ 48).

58. On November 24, 2015, Bland responded to Eaves: "Will do. Actify is the other Master in PR and they are eating the shipping cost and not passing it down to the dealer." (Docket Nos. 307-18 at 3; 336-1 at 17 ¶ 49).

59. On November 24, 2015, Eaves replied to Bland: "Yes I know its Actify, but it's kind of crazy that they are eating such a big cost!" (Docket Nos. 307-18 at 2; 336-1 at 17 ¶ 50).

60. On November 24, 2015, Bland responded to Eaves: "I agree. Would you like me to work with Actify to see if they will pass along similar shipping costs to their dealers there so we have consistency? That is what I wanted to discuss. On dealer comp change calls. Call you later." (Docket Nos. 307-18 at 2; 336-1 at 17 ¶ 51).

61. On November 24, 2015, Eaves replied to Bland: "Yes right now they are creating a non[] competitive environment in the market. This needs to change quickly. Appreciate your help." (Docket Nos. 307-18 at 2; 336-1 at 17-18 ¶ 52).

62. On November 24, 2015, Eric Wong ("Wong"), Sprint's National Account Manager, emailed Bland and carbon-copied Martell: "I hear its $40 per carton. . . Cellustar is charging $2~$2.50 per box unit. [Martell], keep me honest here). I have asked JD to bring to Actify's attn. as well during the peak of the 5 star conversations." (Docket Nos. 307-18 at 1; 336-1 at 18 ¶ 53).

Civil No. 19-1559 (GMM)
Page -19-

63.  On November 24, 2015, Martell responded: "Lol. Emilio [Fivestar] is going to flip. Don't say I didn't warn him." (Docket Nos. 307-18 at 1; 336-1 at 18 ¶ 54).

64.  On November 24, 2015, Wong replied to Martell: LOL. . . can you Periscope him? He said he didn't care. Watch Actify charge more than Actify!" (Docket No. 307-18 at 1).

65.  Up to 2015, Actify did not charge a shipping fee to its retailers in Puerto Rico and the U.S. Virgin Islands for the cellular phones purchased through Ingram, except when the retailer requested overnight or second-day shipping. (Docket Nos. 307-2 at 5-6 ¶ 37; 307-15; 307-9 at 21-23; 336-1 at 18-19 ¶ 55).

66.  On or around 2016, Actify began to invoice a discrete and separate shipping fee to certain of its retailers in Puerto Rico and the U.S. Virgin Islands. (Docket Nos. 307-15; 307-19; 307-20; 336-1 at 19 ¶ 56).

67.  By 2017, Actify would consistently invoice a discrete and separate shipping fee to its retailers in Puerto Rico and the U.S. Virgin Islands. (Docket Nos. 307-15; 307-19; 307-20; 336-1 at 19 ¶ 56).

D.   Dealership termination[3]

68.  The 2011 Agreement states: "This Agreement may be terminated (i) by Supplier . . . for any reason or no reason at all, upon thirty (30) days written notice to the Master Agent." (Docket No. 320-3 at 20 ¶ 22).

69.  The 2013, 2014, and 2017 Agreements states that "this Agreement may be terminated as follows: (i) by Supplier immediately, for

---

[3] These facts are largely immaterial to the Court's analysis of the federal claims before it, yet relevant to the claims brought under state law, specifically pursuant to Law 75. Nonetheless, the Court recounts them herein for fullness of the record.

Civil No. 19-1559 (GMM)
Page -20-

cause, if the Master Agent commits any one or more of the following" enumerated events. (Docket Nos. 305-9 at 25 ¶ 25; 305-10 at 25 ¶ 25; 305-18 at 27 ¶ 25).

70. On November 2, 2015, Wong emailed Adolfo Reyes ("Reyes"), President of Cellustar: "As per our conversation. . . Below is the estimated value of the locations and what I'm proposing Actify pay you for the Fivestar Locations. $27,910 let me know if you have any questions." (Docket Nos. 307-22 at 1; 336-1 at 24 ¶ 70).

71. On November 3, 2015, Sprint's National Account Manager, Joseph Darden ("Darden"), emailed Wong: "Actify is not seeing the value at that NPV [net present value] level given current market conditions and the uncertainty of our go forward strategy with consolidation. Is this something that we can put them in direct contact to negotiate further?". (Docket Nos. 307-24; 336-1 at 25-26 ¶ 73).

72. On November 3, 2015, Wong responded to Darden: "Whoa, who uttered the words consolidation? Sure can, Adolfo Reyes [contact information redacted] May I get a contact at Actify for him to reach out to?" (Docket Nos. 307-24; 336-1 at 26 ¶ 74).

73. On December 21, 2016, Allan Mota ("Mota"), Sprint's Regional Operations Manager for Florida and Puerto Rico, emailed Joseph Williams ("Williams"), Sprint's National Director of Accounts, and carbon-copied Claudio Hidalgo ("Hidalgo"), Eaves, and others:

> [Williams], we have finally completed the b/c [business case] for the Prepaid project we want to pursue in PR, see attached. Pls note that as part of the b/c is also a detailed explanation of the new Inventory Model, in replacement to the current Ingram/Master Agent process . . . Once you approve, we will formally

Civil No. 19-1559 (GMM)
Page -21-

> engage Brightstar to negotiate 3PL [third-party logistics] rates.

(Docket Nos. 307-25 at 2; 336-1 at 26-27 ¶ 76).

74. On January 31, 2017, Mota emailed David Kim ("Kim"), Sprint's Vice President Strategy Operations:

> We have completed an analysis in the Puerto Rico market, where we want to eliminate the 2 Master Agents that serve that market, and instead transition to a model where the local Sprint team contracts directly with local dealer base. This is aligned at a high level to what you have presented as part of the Strategy sessions . . . the Puerto Rico b/c could serve as a pilot/trial for the enterprise, since there are few MAs involved and the suggested process also involves a different approach as it relates to inventory being held locally, on a consignment basis to the Brightstar warehouse in the Island. Pls review the file attached and let me know if you have any questions and if we are authorized to pursue this change.

(Docket Nos. 307-25 at 2; 336-1 at 27 ¶ 77).

75. On January 31, 2017, Kim responded to Mota, carbon-copying Williams and Frock:

> Where has this been vetted operationally? Has Blair Frock been involved on how commissions will flow, contractual and legal notices etc? Traveling now but let's circle up with [Williams] and [Frock] and make sure we have thought thru [sic] all the factors here please. From there, would like to have a call with Dow so he understands the implications.

Civil No. 19-1559 (GMM)
Page -22-

(Docket Nos. 307-25 at 2; 336-1 at 27 ¶ 78).

76.   On February 1, 2017, Mota replied to Kim, carbon-copying Williams, Frock, and Hidalgo:

> Hi [Kim], we have had several calls on this project last year . . . [Williams] requested that we create a b/c that would take into account the impact of dealers involved, commission impact and inventory flows specifically for the PR operation. That is what I have done with the help of the local team in PR. I know [Martell] was also working on back-end processes and the impact of this change on a macro-level. If approved, the PR b/c needs to turn into a project where we will need the support from all of different teams in Prepaid to turn into fruition. We are looking forward to your support in this important initiative to the region.

(Docket Nos. 307-26 at 1; 336-1 at 27 ¶ 79).

77.   On February 1, 2017, Kim replied: "Thanks [Mota] – great, sounds like all the stakeholders are involved. Can you kindly send the business case? And, has this been a project Dow Draper is aware of? If not, we probably need to pull together a few slides on benefit, cause, and why we want to do this." (Docket Nos. 307-26 at 1; 320-1 at 27 ¶ 80).

78.   On February 1, 2017, Mota and Kim exchanged additional emails, carbon-copying Williams, Frock, Hope Halpern, and Hidalgo. These emails included questions and answers regarding commissions, assumption of costs, and potential legal exposure. One of these e-mails from Kim indicate: "Hope have we vetted the legal exposure in PR? I know the legalities are something we need to be thoughtful of." (Docket Nos. 307-26 at 1; 320-1 at 27 ¶ 80).

Civil No. 19-1559 (GMM)
Page -23-

79.   On February 23, 2017, a national press release was issued by Sprint to announce its joint venture with Open Mobile – which, thereafter, became PR Wireless – in Puerto Rico and the U.S. Virgin Islands. While the joint venture was pending approval from the Federal Communications Commission, both companies would continue to operate and compete separately under their respective brands. After receiving the Government's approval, their operations would merge - with Sprint having a 68% economic interest and PR Wireless 32% in the joint venture. Sprint retained 55% of the vote on the Board of Directors, while PR Wireless would hold 45% of the vote. (Docket Nos. 307-28 at 2; 307-29 at 2; 320-1 at 28 ¶ 81).

80.   On February 23, 2017, Williams sent an email to Boyle ("Boyle"), Actify's Vice President of Distribution, and Dennis Doepker ("Doepker"), Actify's Field Sales Organization's Manager, forwarding the press release of the joint venture and indicating: "Press Release went out today! Talk about timing . . . Anyway, lets work to get info we needed to determine next steps and I will look at dates as discussed." (Docket Nos. 307-28 at 1; 320-1 at 28 ¶ 82).

81.   On April 5, 2017, Carlos Cáceres ("Cáceres"), Sprint's Director of the Florida Region, emailed Kim and carbon-copied Williams, Darden, and others:

> I am currently in PR now — [Darden] was also here — Until now 4.0 was [sic] not been offered in PR[.] First of all we did not had [sic] Actify's confirmation of future outlook to invest/not invest. I think this is clear now — We also didn't have any growth partner identified — we have at least 2 now (one of them is TopCell)[.] Third, we had made a decision not to push any new doors with one or the 2 MA's (Cellustar) and focus our efforts

Civil No. 19-1559 (GMM)
Page -24-

> with Actify. I believe all the stars are aligned now, and having said this: the opportunity in PR is huge! I am looking ad minimum 50% growth (50 more doors) so we should now move fast with 4.0 and allowed and offer in PR. Source of supply of fixtures need to be defined based on costing.

> (Docket Nos. 307-30 at 1; 320-1 at 28-29 ¶ 83).

82. On April 26, 2017, Sprint and Cellustar signed into the 2017 Agreement, with the effective term of May 1, 2017 to August 1, 2017. (Docket No. (Docket Nos. 307-32 at 1; 320-1 at 29 ¶ 84).

83. On May 2, 2017, Matt Holman ("Holman"), Actify's Regional Sale Manager, emailed Cáceres:

> Good afternoon, I'm trying to work on putting together a forecast model for the additional sales we will have this year in Puerto Rico and S. Florida. Is there a way to send me over an average of how many activations and upgrades you are currently getting out of the Cellustar doors that you are wanting to transition over to us? If I can get that from you, it will give me a good baseline to forecast what our total business would look like in PR/VI.

> (Docket Nos. 307-33 at 1; 320-1 at 29 ¶ 85).

84. On May 2, 2017, Cáceres carbon-copied Eaves, stating: "Hi [Holman]: adding [Eaves] she can provide this to you." (Docket Nos. 307-33 at 1; 320-1 at 30 ¶ 86).

85. On May 2, 2017, Holman responded to Cáceres and Eaves: "To make this real easy, if you can tell me how many activations PR/VI did in April, I can subtract mine and get the number.

Civil No. 19-1559 (GMM)
Page -25-

> I don't want anybody to have to do a lot of work to get this done. Just need some rough numbers." (Docket Nos. 307-33 at 1; 320-1 at 30 ¶ 87).

86.  On May 2, 2017, Cáceres replied: "2.814." (Docket Nos. 307-33 at 1; 336-1 at 29-30 ¶ 88).

87.  On May 23, 2017, Emilio Concepción, of Fivestar, emailed Sprint: "Im [sic] very excited to submit this addresses for approval for 4.0 locations in Puerto Rico." (Docket Nos. 307-34 at 2; 320-1 at 30 ¶ 89).

88.  On May 23, 2017, Kim emailed Cáceres, Williams, Eaves, and others:

> I need to know what the plan is in Puerto Rico? I have not heard if the brand is pivoting to Open Mobile or not. This is a key item we need to understand prior to investing the costs to get 4.0 in Puerto Rico. Especially, if we are making an investment. [Cáceres] – can you provide us with what the plan is?

> (Docket Nos. 307-34 at 1; 320-1 at 30 ¶ 89).

89.  On May 24, 2017, Hidalgo responded: "Hi [Kim], we need to hold for the moment, we will have a[] Steering com[m]i[t]tee on June 15th and will decide on next steps for the Brand." (Docket Nos. 307-34 at 1; 320-1 at 30 ¶ 89).

90.  On June 19, 2017, Cáceres emailed Kim, Williams, Hidalgo, Eaves, and others: "We finally received confirmation that Boost is the brand that will remain in PR — (for prepaid, not OPEN Mobile). We will like to have a call with you (and Jim [Atkinson] of course), to be able include PR in the 4.0 program ASAP." (Docket Nos. 307-35; 320-1 at 30-31 ¶ 90).

Civil No. 19-1559 (GMM)
Page -26-

91.  On June 21, 2017, Cáceres emailed Eaves and Hidalgo:

> Cellustar: are we moving them below a MA, or you want to keep them as being served direct (hybrid model), I believe that there is a law that can protect them from being moved from MA category? Their non owned stores need to move to Actify or TCI (NY based). [Eaves] met with this new MA, and corporate is proposing to have them as a second MA, they are currently now based in PR.

(Docket Nos. 307-36 at 2-3; 336-1 at 30-31 ¶ 91).

92.  On June 21, 2017, Eaves responded to Cáceres and Hidalgo:

> As we just discussed the Cellustar challenge[] can be managed [by] having them become a direct model with an a[]t[t]ractive structured compensation so we do not de- motivate their selling interest. Nevertheless having a new business model in the JV can be consulted with legal to come up with a strategy that minimizes any legal risk given the legal restrictions in Puerto Rico. On the other hand our agreement with Actify is a National agreement and not a local one, this might help us in the consolidation process. In any event how we manage this case needs to be in agreement with legal.

(Docket Nos. 307-36 at 2; 320-1 at 31-32 ¶ 92).

93.  On June 21, 2017, Cáceres forwarded Eaves' email to Kim, Atkinson and Williams. (Docket Nos. 307-36 at 1; 320-1 at 31-32 ¶ 92).

94.  On June 22, 2017, Williams emailed Cáceres, Kim, Atkinson, and others:

Civil No. 19-1559 (GMM)
Page -27-

> Can you schedule a call with Mary Hull in legal to go through the Cellustar contract and determine how [to] move forward? I think we could move Cellustar to a direct contract for their own locations and offer them the PBR+ spiff when they open new doors, however, we would not pay them the master agent residual or RTR moving forward. We most likely would need to calculate some type of master agent residual NPV for them to help them transition away from the MA model. Additionally, since this [is] a JV, do we remove PR from our masters contract and will they be signing a new agreement with the JV to do business down there?

(Docket Nos. 307-36 at 1; 320-1 at 32 ¶ 93).

95.   On July 20, 2017, Cáceres emailed Kim, carbon-copying Darden, Willliams, Eaves and Atkinson:

> Hi all: from our support in distribution and forecast for prepaid doors, recommended actions and mix of doors to be integrated doors from Open we are done. I believe this was used to send the forecast to Finance (total GAs target for business case including Open stores). [Eaves] has an updated regarding the mix of doors (4.0, remodeling, Kiosks, etc) and a comparison vs Claro, ATT, TMob by municipality. I am ok to join any proposed time for the call, but [Eaves] is "Queen and King" of PR :)" (Docket Nos. 307-37 at 1; 320-1 at 32 ¶ 94).

96.   On July 26, 2017, Sprint, Actify, and Cellustar received a request from McDougall, one of Cellustar's dealers, requesting a change of Master Agent from Cellustar to Actify. In reacting to this request, Actify's Doepker emailed Actify's Holman: "FYI, looks like we got the first conversion." (Docket Nos. 307-38 at 1-2; 320-1 at 32 ¶ 95).

Civil No. 19-1559 (GMM)
Page -28-

97. On July 26, 2017, Doepker responded to his own email: "Did you say you received activation/upgrade and 3MR data from Darden on these doors? If not, please see if you can get it to me before I approve. Thanks." (Docket Nos. 307-38 at 1-2; 320-1 at 33 ¶ 96).

98. On July 26, 2017, Holman forwarded the email chain to Darden: "Can you go ahead and send me the data on the doors coming over from Cellustar." (Docket Nos. 307-38 at 1-2; 320-1 at 33 ¶ 96).

99. On July 27, 2017, Holman and Eaves coordinated a dinner meeting with Boyle, Juan Saca, CEO of Open Mobile, and Williams where Eaves expressed interest in seeing "a preliminar[y] presentation [that Sprint] would be sharing with these dealer[s]." (Docket No. 307-39 at 2).

100. On August 1, 2017, Sprint and Actify signed "Amendment No. 8 to the Prepaid Wireless Product Agreement Between Sprint Solutions Inc. and Actify, LLC," extending the effective term of the agreement to August 1, 2020. (Docket Nos. 307-40 at 1; 320-1 at 33 ¶ 98).

101. On September 11, 2017, Maritza González, Program Manager for Sprint, emailed Juan Rosario ("Rosario"), Director of PR Wireless, Eaves, Darden and others a table with different tasks to be completed for the plan to integrate Open Mobile into Sprint. (Docket Nos. 307-41; 336-1 at 34 ¶ 99).

102. The second line of the table indicated the task: "Create plan to protect OM [Open Mobile] Indirect dealers doors." This task is labeled as "High" priority with "Major Issue" status. A comment next to this task reads: "Already spoke to Actify and Boost teams. Joe Darden will incorporate to transition team. See comment in cell. Waiting from Juan Rosario for compensation comparison to dealers and Joe

Civil No. 19-1559 (GMM)
Page -29-

Darden to do full presentation on Boost." (Docket Nos. 307-41 at 2; 336-1 at 34 ¶ 99).

103. The eighteenth line of the table indicates the task: "Cellustar – Potential consolidation with Actify." This task is labeled as "High" priority with "Risk" status. A comment next to this task reads: "On hold. Waiting on legal advi[c]e from Sprint." (Docket Nos. 307-41; 336-1 at 34 ¶ 100).

104. On November 20, 2017, Sprint and Cellustar signed "Amendment No. 1" to the 2017 Agreement, thereby extending the effective date of the 2017 Agreement from May 1, 2017 to March 1, 2018. (Docket Nos. 307-42; 320-1 at 34 ¶ 102).

105. On November 2 and November 3, 2017, Williams, Eaves, and others exchanged various emails to report that Cellustar set up its registration on Ingram's new payment portal and made a $100,000 payment against their $300,000 balance. (Docket Nos. 307-43 at 1-3; 320-1 at 34-35 ¶ 103).

106. On November 3, 2017, in response to Reyes' payment, Kim emailed Williams: "Why don't we term them?" (Docket Nos. 307-43 at 1; 320-1 at 34-35 ¶ 103).

107. On November 13, 2017, Sherri Simasek ("Simasek"), Sprint's Indirect Channel Optimization Manager, issued a "Team Weekly Readout" to Kim and Williams with an update on Open Mobile's integration into Boost Mobile:

> We are working with the Puerto Rico team to assess and bring back online stores as they get up and running with the ability to serve customers not just sell accessories. Current plan is to have Actify begin signing up Open Mobile dealers to carry Boost in their store, then eventually pulling the Open Mobile brand after about 9-12 months.

Civil No. 19-1559 (GMM)
Page -30-

(Docket Nos. 307-44 at 8; 320-1 at 35 ¶ 104).

108. On the December 1, 2017 edition of "Frock Prepaid Sales Ops: Weekly Status Update Report," Sprint indicates: "Open Mobile Puerto Rico Joint Venture: Goal is to onboard ~125 doors in Q1'18. Recommendation is roll them in all under Actify." (Docket Nos. 307-45 at 4; 336-1 at 35 ¶ 105).

109. Between January 9 and 12, 2018, officials from Actify and Sprint met at a convention in Las Vegas. Eaves and Rosario discussed with Actify's Doepker and Frank Boyle ("Boyle") the potential of terminating Cellustar as a Master Agent in Puerto Rico and making Actify the only Master Agent in Puerto Rico, by acquiring all of Cellustar's retailers. (Docket Nos. 307-9 at 14-17; 315-4 at 5-7; 336-1 at 36-37 ¶ 106).

110. On January 15, 2018, Doepker emailed Eaves and Rosario, carbon copying Actify's Boyle and Jim Flowers ("Flowers"), Ingram's Market Developer:

> We appreciated the time we were able to spend with you both last week at [Las Vegas convention]. We thought the meeting was very productive and we look forward to helping you reach your goals at PR Wireless. Two follow up items from the meeting included the performance detail around the Open Mobile stores and MDF [market development fund] investments. Once we have those details we can begin to build our business case to support the business in PR/VI. We also discussed a regular conference call to establish a cadence around communications. Once you get past your meeting [] this week, let's look at setting a weekly call to touch base.

(Docket Nos. 307-47 at 1; 336-1 at 37 ¶ 107).

Civil No. 19-1559 (GMM)
Page -31-

111. On January 18, 2018, Rosario responded to Doepker:

> Please fin[d] attached the performance report per location divided into COR [corporate-owned retail stores] and [independent] Dealers. Please note that there [are] two locations marked with a yellow color. These two locations are the same but it was a transfer between owner. What is pending is the conversion to 3rd month engagement, this item should be ready by tomorrow. On the other hand, we are [sic] want to expedite the doors conversion to Boost as soon as possible. Our dealers partners are waiting to [sic] us provide to them the MDF package and rebrand support. Let us know how we can help you guys so we can came back to them moving forward with the agreements and documents. You can use an estimate of $15,000 per door (preliminary, just to start building the case and discussion). We propose also to have a separate conversation related to the COR doors.

> (Docket Nos. 307-47 at 1; 336-1 at 37 ¶ 108).

112. On January 25, 2018, as part of the process of converting Open Mobile stores into Boost Mobile stores, Rosario provided all Open Mobile retail stores documents for onboarding with Actify as their Boost Mobile Master Agent. (Docket Nos. 307-48 at 3-7; 320-1 at 37 ¶ 109; 315-5).

113. On January 27, 2018, Rosario emailed Doepker and Ingram's Flowers, carbon-copying Boyle and Eaves:

> It is our best understanding that this last week, the on boarding process with some of the OM's [Open Mobile's] legacy dealers had started. We appreciate all the support provided in this effort and

Civil No. 19-1559 (GMM)
Page -32-

> we are sure that you are employing all of you to make this project done in the shorter time possible. We need to identify a cadence of the process in this next week so all the next steps and responsible are crystal clear and defined. Also we need to create the right expectations inside and outside the organization of when will be possible to start selling the product in the Open Mobile legacy doors. Please consider that we expect to start this process very soon, targeting March 15th as the customer migration launch date. Nevertheless, new activations should be something that we want to start at March 1st. Dealers and our COR stores will start making all the necessary arrangements to start deploying the stores rebranding efforts very soon too and in order to accomplish that, we need to have the MDF package and agreements done. Please let us know when we can kick off these activities and create with certain frequency conference calls to provide status and co-work in this huge opportunity.

(Docket Nos. 307-50 at 3; 336-1 at 37-38 ¶ 110).

114. On January 29, 2018, Doepker responded to Rosario with questions regarding Actify's onboarding process. (Docket Nos. 307-50 at 2-3; 320-1 at 38 ¶ 111).

115. On January 30, 2018, Rosario replied to Doepker with answers. Among the answers provided, Rosario indicated that a total of 110 retail stores would come from Open Mobile to Actify, including 21 corporate stores and 89 independent stores. (Docket Nos. 307-50 at 2; 320-1 at 38-39 ¶ 112).

116. On February 1, 2018, Sprint and Actify began to have weekly calls to discuss Open Mobile's

Civil No. 19-1559 (GMM)
Page -33-

transition into Boost Mobile. (Docket Nos. 307-51 at 2; 307-52 at 2-3; 336-1 at 39 ¶ 114).

117. On February 5, 2018, Rosario emailed Doepker, Boyle, Eaves, Flowers, Darden, among others, with a periodic forecast of the incremental gross additions of new customers and migrations of existing customers that are expected from Open Mobile to Boost Mobile. (Docket Nos. 307-51 at 1; 320-1 at 39 ¶ 113).

118. On February 8, 2018, Sprint and Actify had a call where it was discussed granting Actify a $2.50 customer migration commission and a $5.50 customer migration commission to the respective retailer, for a total of $8.00. Cellustar was also discussed: "Confirm timing of existing Boost under Cellustar to move to Actify? Reasonable to plan by end of Q3 for shift? ~ [Rosario] will talk with [Eaves] and let [Doepker] know." (Docket Nos. 307-52 at 1; 336-1 at 39 ¶ 114).

119. On February 15, 2018, Sprint and Actify had a call where PR Wireless confirmed that it was planning to match Actify's MDF contribution. It was also discussed: "Confirm timing of existing Boost under Cellustar move to Actify? Reasonable to plan by end of Q3 for shift? . . . [Rosario] agrees with this timing." (Docket Nos. 307-53 at 1; 336-1 at 39-40 ¶ 115).

120. On March 2, 2018, Darden emailed Williams:

I am definitely all in when it comes to Actify and all of the stuff necessary to launch the stores, but we need to shift some of the legal contract, settlement, commission, operational issues over to someone who can live and breathe that every day. I cannot give it 100% of my time, especially since the numbers roll up somewhere else . . . . But someone else needs to take this over and manage it, I don't have the bandwidth beyond the

Civil No. 19-1559 (GMM)
Page -34-

> sales and distribution as it pertains to Actify.

(Docket Nos. 307-54 at 3; 336-1 at 40 ¶ 116).

121. On March 2, 2018, Williams responded to Darden, carbon-copying Eaves, and Frock, among others: "We need to look at how PR Wireless is being handled at this point . . . and I need someone from your team to take it over." (Docket No. 307-54 at 2).

122. On March 2, 2018, Eaves replied to Williams and Darden, carbon-copying others:

> As you all know we are moving many parts on top of the hurricane fiasco; right now, we are in the process of on boarding 88 doors that will be selling Boost in a couple of weeks in order to manage migration of 200k plus customers in the legacy Open Mobile systems. We have several dealers on hold with contractual questions that we have received conflicting answers. I will appreciate [i]f we can get a point of contact that can help us expedite this discussion so we can move forward.

(Docket Nos. 307-54 at 1-2; 336-1 at 40-41 ¶ 117).

123. On March 2, 2018, Sprint requested Cellustar provide "[t]he two most recent years of financials to include balance sheet, income statement, and statement of cash flows," indicating that "[Sprint] will need all the information below to complete the base line review." (Docket Nos. 307-55 at 2; 336-1 at 41 ¶ 119).

124. On March 15, 2018, in response to Sprint's request of information to Cellustar, Wong emailed Jeffrey Mosbauer ("Mosbauer"), Sprint's National Account Manager: "Let me know if you've already sent to [Reyes] or no

Civil No. 19-1559 (GMM)
Page -35-

need since they're going under Actify?" (Docket Nos. 307-55 at 1; 336-1 at 41 ¶ 120).

125. On March 15, 2018, Mosbauer replied to Wong: "I have not sent based on that but I'm not sure if they should still fill this out." (Docket Nos. 307-55 at 1; 336-1 at 41-42 ¶ 121).

126. On April 4, 2018, Cellustar's Reyes emailed PR Wireless' Rosario and Reyner Palomino ("Palomino"), Sprint's Indirect Sales Manager, requesting a meeting to discuss Cellustar's concerns after becoming aware that Sprint offered to Actify one of Cellustar's dealers, MJ Connection, as part of Sprint's plan to have Actify as the only Master Agent for all former Open Mobile retail stores. (Docket Nos. 307-2 at 9 ¶¶ 61-63; 315-6; 336-1 at 43 ¶ 125).

127. On April 10, 2018, Reyes met with Rosario and Eaves, where the latter denied that Cellustar's distribution contract would be terminated and offered that ARF Marketing, one of Cellustar's dealers, assume the former Open Mobile corporate store in Plaza Escorial. (Docket Nos. 307-2 at 9 ¶ 65; 315-8 at 2; 320-1 at 42 ¶ 126).

128. This former Open Mobile corporate store in Plaza Escorial was offered to Cellustar only after Fivestar, an Actify dealer, refused to assume the lease of the store. Reyes later rejected this Plaza Escorial store because the rent was too high. (Docket Nos. 307-2 at 12 ¶¶ 88-89; 320-1 at 52 ¶ 154; 336-1 at 54 ¶ 153).

129. After Cellustar's rejection of the Plaza Escorial store, Sprint offered it again to Fivestar, which agreed to assume the lease pursuant to an Operating Agreement with PR Wireless that included the following provision: "PRWPR [PR Wireless] will reimburse Fivestar up to a monthly amount of SIXTEEN THOUSAND FOUR HUNDRED SIXTY-FOUR DOLLARS

Civil No. 19-1559 (GMM)
Page -36-

($16,464) for the Plaza Escorial store." (Docket Nos. 336-5 at 2 ¶ 3a; 336-1 at 54 ¶ 155).

130. Neither Sprint nor PR Wireless ever offered Cellustar or ARF Marketing monies, benefits, or rent subsidies to assume any former Open Mobile corporate or retailer store, including the Plaza Escorial store. (Docket Nos. 307-2 at 12 ¶ 91; 336-1 at 54-55 ¶ 156).

131. After Open Mobile's transition into Boost Mobile, 109 former Open Mobile retail stores used Actify as its Master Agent, of which 20 were former corporate stores and 89 were former independent stores. Only one former Open Mobile retail store used Cellustar as its Master Agent. (Docket Nos. 305-30 at 5; 305-32 at 8-9; 307-2 at 11 ¶ 82, 12 ¶ 94; 320-1 at 50 ¶ 146, 53 ¶ 159).

132. On April 16, 2018, Eaves met with Reyes to discuss the relationship between Sprint, PR Wireless, and Cellustar. Eaves informed that, to continue acting as a Master Agent, Cellustar would need to invest in remodeling all of Cellustar's retail stores and implement additional terms, as a result of the "4.0" initiative to convert all Master Agents to Direct Distribution Partners ("DDPs"). (Docket Nos. 305-33 at 2-3; 305-34 at 3; 305-36 at 6-7; 307-2 at 9 ¶ 66; 315-8 at 2; 320-1 at 42-43 ¶ 127).

133. On April 17, 2018, Reyes emailed Eaves to request additional information regarding the terms that Cellustar must comply with in accordance with Sprint's "4.0" initiative, in order "to be clearer and make a better decision that benefits us all. Always with the aim of being able to continue serving you as a distributor as has been done for almost 8 years." (Docket Nos. 305-33 at 2-3; 305-34 at 3; 315-8 at 2; 315-9 at 2-6; 336-1 at 44 ¶ 128).

Civil No. 19-1559 (GMM)
Page -37-

134. On April 18, 2018, Reyes emailed Actify's Holman, carbon-copying Eaves:

> This week I was meeting with [Eaves] and her staff. Within the meeting we discussed all the plans and changes for the Master Agents. In the meeting several possibilities arose and one of them was the one that Cellustar negotiates its doors and the business they generate with another Master Agent. As a first instance, I thought about your company as you do business in PR and Virgin Islands. We would like to know if your company would have any interest in buying the distribution of the doors that Cellustar has. Waiting for your answer to this matter.

(Docket Nos. 305-35 at 2; 305-36 at 8-10; 336-1 at 44 ¶ 129).

135. On April 18, 2018, Holman forwarded Reyes' email to Actify's Boyle, indicating: "[Boyle], let's talk tomorrow about how you want to approach this. He copied [Eaves], which makes me think there may be some validity about selling to another master. Everything that we've committed to there has been on the understanding that Actify would be the only MA." (Docket Nos. 307-61 at 1; 336-1 at 44-45 ¶ 130).

136. On April 18, 2018, Boyle responded to Holman, carbon-copying Doepker: "Let[']s get some clarification from [Eaves] or [Rosario] on the call tomorrow. My guess is he is just trying to see if he can get something. Don[']t respond until after we have had time to discuss tomorrow." (Docket Nos. 307-61 at 1; 336-1 at 44-45 ¶ 130).

137. On April 20, 2018, Reyes emailed Eaves, indicating:

Civil No. 19-1559 (GMM)
Page -38-

> After analyzing the points discussed in our meetings, and analyzing the entire evolution and positive changes we're experiencing, and the growth and opportunity projections, we have decided to provide our support for all of them and be part of this entire evolution. Cellustar is always committed to the brand and willing to support its growth and strengthen it as a business partner. As always, I'm grateful for the opportunity that has been provided. . . . Note: waiting for the documentation on the change from MA to DDP. Please sent it over as soon as you have it."

(Docket Nos. 305-37 at 2; 336-1 at 45-46 ¶ 131).

138. On April 23, 2018, Eaves emailed PR Wireless' Rosario, carbon-copying Actify's Holman and Sprint's Palomino: "

> There are two scenarios that might present a risk and we have to be prepared to handle with a well thought plan in case of a crisis. . . . The second situation is Cellustar, most likely his master contract will not be accepted and we have 9 of his doors at risk if for some reason he does want to continue his doors with Actify. We also need to understand how quickly we can flip his 17 dealers to Actify and how willing these dealers a[r]e to flipping. Again I am looking for a plan to minimize Budget risk.

(Docket Nos. 307-62; 336-1 at 46 ¶ 132).

139. On May 1, 2018, Reyes and Eaves held a meeting in which Eaves informed Reyes that the distribution contract between Sprint and Cellustar would not be renewed, effective as of June 30, 2018. Eaves requested that Cellustar assist in transitioning Cellustar's

Civil No. 19-1559 (GMM)
Page -39-

dealers and retail stores to Actify. (Docket Nos. 95 at 9 ¶ 45; 305-36 at 18-20; 305-38 at 2; 307-2 at 10 ¶ 71; 336-1 at 46-47 ¶ 134).

140. At the May 1, 2018 meeting, Reyes received a Nondisclosure Agreement with the following term:

> Cellustar, in its capacity as a Boost Mobile retailer, agrees that it will open at least 5 new Boost Mobile stores in Puerto Rico by December 31, 2018. Such new Facilities must be processed and approved through Sprint's standard real estate approval process. Sprint will use its reasonable business judgement in evaluating proposed new locations, and will use commercially reasonable business judgement in deciding whether to provide approval. If Cellustar opens such 5 new Boost Mobile Stores, then on or about February 15, 2019, Sprint will pay Cellustar an amount equal to the residual compensation set forth in Attachment C of the Master Agent Agreement, if the Master Agent Agreement had remained valid and not terminated for the four months after June 30, 2018.

(Docket Nos. 305-36 at 21; 305-39 at 2 ¶ 2; 307-64 at 1 ¶ 2; 336-1 at 47 ¶ 135).

141. On May 18, 2018, Eaves emailed Holman and Palomino, carbon-copying Williams and Mosbauer:

> [Reyes] would like to have a meeting next Monday morning with you to discuss his dealer transition plan in detail. It[']s important for this meeting to be early in the morning as he will be announcing the transition plan to all his dealers on one to one meetings starting that same Monday at 11am.

(Docket Nos. 307-65; 336-1 at 47-48 ¶ 136).

Civil No. 19-1559 (GMM)
Page -40-

142. On May 21, 2018, Reyes met with PR Wireless' Eaves and Rosario, Actify's Holman, and others to discuss the Master Agent transition from Cellustar to Actify for Cellustar's 17 dealers and 58 retail stores. Such a transition was planned to be completed by July 1, 2018. (Docket Nos. 305-40 at 2; 305-41 at 3-19; 307-66 at 1; 336-1 at 48 ¶ 137).

143. On May 31, 2018, Reyes emailed Eaves with questions regarding credits, inventory, commissions for products sold by Cellustar after the planned termination date of June 30, 2018, and the effective date of the commissions to be paid to Cellustar under the Nondisclosure Agreement. (Docket Nos. 315-11 at 2-3; 336-1 at 48 ¶ 138).

144. On June 1, 2018, Eaves forwarded Reyes' questions to PR Wireless' Palomino, who then forwarded them to Mosbauer. (Docket No. 307-67 at 2).

145. On June 1, 2018, Mosbauer responded to Palomino with answers to Reyes' questions and indicated: "These are not negotiable if we don't get this signed the contract will still expire 5/30 and 4 incremental months of residual will not be paid out. Please get this sig[n]ed." (Docket Nos. 307-67 at 2; 336-1 at 48-49 ¶ 139).

146. On June 5, 2018, Mosbauer emailed Palomino, carbon-copying Eaves: "Why has this not been signed? Again[,] failure to do so will void the 4 month residual and termination of contract will happen regardless." (Docket No. 307-67 at 1-2).

147. On June 8, 2018, Eaves responded to Mosbauer, carbon-copying Palomino: "I already discussed this with [Reyes]." (Docket No. 307-67 at 1).

Civil No. 19-1559 (GMM)
Page -41-

148. On June 8, 2018, Mosbauer replied to Eaves, carbon copying Palomino: "Still nothing signed and back." (Id.).

149. On June 8, 2018, Eaves replied to Mosbauer, carbon-copying Palomino:

> I told him, he cancelled his meeting because he was sick last Tuesday. Can you have [Wong] check if we send [sic] him an e-mail stating that if we don[']t receive the sign document today Sprint offer is no longer valid and regular termination will occur with no exemption on June 30th? We are already on boarding his dealers.

(Docket Nos. 307-67 at 1; 336-1 at 49 ¶ 140).

150. On June 8, 2018, Eaves emailed Reyes, carbon-copying Mosbauer and Palomino:

> Just a note to let you know that Sprint last day to receive your sign document is today as I mentioned to you last Tuesday. If Jeff Mosbauer does not receive the document sign[ed] today the offer will not be valid and regular termination process will follow in [sic] June 30th as your termination date like we discussed.

(Docket Nos. 307-68 at 2; 336-1 at 49-50 ¶ 141).

151. On June 11, 2018, Cellustar sent a cease-and-desist letter to Sprint and PR Wireless, warning that Sprint would be violating the Puerto Rico Dealer's Act by unjust termination of Cellustar's distribution contract. (Docket Nos. 305-36 at 22-23; 305-42 at 2-6; 307-68 at 1, 4-5; 320-1 at 48 ¶ 142).

152. On June 12, 2018, after receiving Cellustar's cease-and-desist letter, Sprint rescinded its intent to not renew Cellustar's dealership as

Civil No. 19-1559 (GMM)
Page -42-

of June 30, 2018. (Docket Nos. 95 at 9-10 ¶¶ 45-49; 320-1 at 48 ¶ 143).

153. On June 12, 2018, Vanessa Mangual Rivera of Cellustar emailed all Cellustar retailers to notify that the intended Master Agent transition from Cellustar to Actify had been canceled. (Docket Nos. 305-36 at 13-17; 322-1 at 22 ¶ 85).

154. On June 13, 2018, Eric Andrews ("Andrews"), Sprint's Senior Legal Counsel, emailed Cellustar's counsel Herman Colberg-Guerra ("Colberg"): "Thank you [Colberg]. We confirm that we will not continue with Cellustar's termination at this time. We will provide you and your client prior written notice in the event that the situation changes, and look forward to reviewing your client's proposal." (Docket No. 307-73 at 3).

155. On June 13, 2018, Colberg responded: "Cellustar has informed its retailers that the termination was put off. However, please inform Actify to not continue contacting Cellustar's retailers to enter into retailer agreements with them. This constitutes a breach of Actify's obligations toward Sprint, as all Master Agents are prohibited from soliciting other Master Agent's retailers." (Id. at 2).

156. Sprint and Cellustar continued their dealer relationship until July 1, 2020, when DISH acquired Boost Mobile from Sprint. (Docket Nos. 305-24 at 10-11; 322-1 at 22-23 ¶ 87).

157. Up to July 1, 2020, Cellustar continued to sell Boost Mobile prepaid cellular phones and Sprint's wireless services to customers through retail dealers; Cellustar continued to have a line of credit with Sprint; and Sprint continued to pay commissions and residuals to Cellustar. (Docket Nos. 305-7 at 12 ¶ 31; 305-24 at 11; 322-1 at 22 ¶ 87).

Civil No. 19-1559 (GMM)
Page -43-

158. After July 1, 2020, Sprint no longer was involved in the operation of the Boost Mobile brand. (Docket Nos. 305-8 at 9-10; 322-1 at 23 ¶ 93).

159. DISH is responsible for all conduct complained of after July 1, 2020. (Docket Nos. 305-7 at 12 ¶¶ 32-34; 322-1 at 23 ¶ 94).

160. Sprint does not owe Cellustar for commissions, given that DISH has already paid Cellustar on Sprint's behalf. (Docket Nos. 95 at 12 ¶ 60; 305-7 at 16 ¶ 53; 322-1 at 26 ¶ 112).

161. On August 1, 2021, Cellustar sold its distribution business as a Master Agent to DCI. (Docket Nos. 305-8 at 10-11; 322-1 at 23 ¶ 95).

162. Actify ceased being a Master Agent in September 2021. (Docket Nos. 305-6 at 9; 322-1 at 23 ¶ 90).

E.   Allocation of constrained inventory

163. The 2011, 2013, 2014, and 2017 Agreements state that:

> Supplier may increase, decrease or alter the range of Products or alter the Products in any manner whatsoever at any time; however, Supplier will inform the Master Agent of such alterations. Supplier and its fulfillment intermediary each reserves the right to accept or decline (in its absolute discretion) any order for Products in whole or in part and confirmation of such acceptance or decline of an order will be communicated to the Master Agent. No order for Products will be accepted unless it is for the Minimum Order Quantity (MOQ) (if any) as set out in Attachment A, which Supplier may change

Civil No. 19-1559 (GMM)
Page -44-

> with notice to Master Agent, provided Master Agent shall only place such orders as will permit it to hold a reasonable amount of inventory. Supplier reserves the right to specify maximum allocations to Master Agent of any Product in certain geographic areas, as may be notified in writing to Master Agent, and Master Agent agrees not to place orders for Product intended to be distributed in any such area in excess of any allocation specified. Supplier also reserves the right to change any such allocation (at any time, except that no allocation will be reduced below the aggregate number of orders already accepted subject to such allocation).
>
> (Docket Nos. 320-3 at 13 ¶ 3(a); 305-9 at 15 ¶ 4(a); 305-10 at 15 ¶ 4(a); 305-18 at 15-16 ¶ 4(a); 334-2 at 18-20 ¶¶ 45-47; 336-1 at 87-88 ¶¶ 22-24).

164. Under the 2017 Agreement, Cellustar "may sell only those cable TV, satellite TV, internet and/or broadband products and/or services to Retailers in the Territory or Territories which are first approved by Sprint in writing, such approvals which may be revoked by Sprint at any time in Sprint's sole discretion." (Docket Nos. 305-18 at 14; 336-1 at 6 ¶ 18).

165. Sprint did not always receive enough cellular phones from manufacturers to fulfill the requests of the Master Agents. (Docket Nos. 305-5 at 4; 305-26 at 4; 322-1 at 11 ¶ 48).

166. When Sprint did not have enough cellular phones, the available inventory was considered constrained. (Docket Nos. 305-5 at 6-9; 322-1 at 12 ¶ 50).

167. In 2020, inventory was particularly constrained, due to a chip shortage caused by LG, a chip manufacturer, exiting the mobile

Civil No. 19-1559 (GMM)
Page -45-

phone market. (Docket Nos. 305-5 at 7-8; 322-1 at 12 ¶ 52).

168. From 2011 onward, inventory was frequently constrained. (Docket Nos. 305-5 at 7-8; 322-1 at 12 ¶ 51).

169. Prior to its joint venture with Sprint, PR Wireless allocated constrained inventory by sending such inventory to regions where the prepaid cellular phones were selling the fastest, without regard to ensuring an equal allocation of constrained inventory among Master Agents. (Docket Nos. 305-30 at 14; 322-1 at 12-13 ¶¶ 53-55; 336-1 at 66 ¶ 183, 89-90 ¶¶ 30-32).

170. Prior to September or October 2017, Sprint would generally allocate constrained inventory among Master Agents using as a baseline the Master Agents' average gross additions of new customers. (Docket Nos. 305-5 at 10-14; 305-26 at 9-19; 307-76 at 27-28; 322-1 at 12-13 ¶¶ 53-55, 16 ¶ 62; 336-1 at 66 ¶ 183, 89-90 ¶¶ 30-32).

171. After September or October 2017, Sprint would strictly allocate constrained inventory among Master Agents on the basis of each Master Agent's share of gross additions of new customers ("SOGA"). (Docket Nos. 305-5 at 10-14; 305-26 at 9-17; 307-76 at 27-28; 322-1 at 12-13 ¶¶ 53-55; 336-1 at 66 ¶ 183, 89-90 ¶¶ 30-32).

172. The SOGA formula consists of the total number of items available in constrained inventory multiplied first by the region's share of total gross additions of new customers (i.e., the region's gross additions divided by total gross additions) and second by the Master Agent's share of gross additions of new customers within that region (i.e., the Master Agent's gross additions for the region, divided by the region's total gross

Civil No. 19-1559 (GMM)
Page -46-

additions). (Docket Nos. 320-1 at 64 ¶ 182; 336-1 at 66 ¶ 182).

173. Cellustar did not have a written policy for allocating its own constrained inventory among its dealers and retail stores. (Docket Nos. 305-7 at 18 ¶ 63; 305-29 at 4; 322-1 at 15 ¶ 61).

174. Between January 2017 and January 2018, prior to the onboarding of former Open Mobile retail stores, Cellustar had 25,557 gross additions of new customers, representing 62% of the total amount of gross additions during that period in Puerto Rico and U.S. Virgin Islands; Actify had 15,917 gross additions of new customers, representing the other 38%. (Docket Nos. 307-87; 307-88 at 13-19, 60, 62; 336-1 at 70 ¶ 191).

175. Between February 2018 and November 2019, after the onboarding of former Open Mobile retail stores, Cellustar had 46,550 gross additions of new customers, representing 25% of the total amount of gross additions during that period in Puerto Rico and U.S. Virgin Islands; Actify had 137,580 gross additions of new customers, representing the other 75%. (Docket Nos. 307-88 at 13-19, 61, 63; 336-1 at 70-71 ¶ 192).

176. After Actify received the majority of former Open Mobile retail stores, whenever there was a constrained product in high demand, Cellustar would likely get less of this product because it was smallest Master Agent, in the smallest region, and therefore had the smallest SOGA. (Docket Nos. 307-2 at 17 ¶ 118; 307-70 at 16-17; 336-1 at 69 ¶ 189).

177. Between July 12, 2018 and May 30, 2019, Actify's SOGA was 85.41%; Cellustar's SOGA was 14.59%. (Docket Nos. 307-89 at 54-55; 336-1 at 71 ¶ 194).

Civil No. 19-1559 (GMM)
Page -47-

178. Between June 27, 2019 and June 18, 2020, Actify's SOGA was 80.56%; Cellustar's SOGA was 19.44%. (Docket Nos. 307-89 at 55-57; 336-1 at 71 ¶ 194).

179. On June 1, 2018, Sprint's Simasek emailed Mosbauer, Williams, Darden, Wong, Kim, and others a table showing that Cellustar would receive 0.68% of Sprint's inventory of pre-owned iPhone 6 cellular phones – representing a total of 198 cellular phones. (Docket Nos. 307-71 at 2; 336-1 at 58-60 ¶ 166).

180. On June 1, 2018, Mosbauer responded "Don't give anything to cellustar." (Docket Nos. 307-71 at 2; 336-1 at 58-60 ¶ 166).

181. On June 1, 2018, Simasek replied with an updated table that marked zero allocations of pre-owned iPhone 6 cellular phones for Cellustar. DDPs were notified of this updated table. (Docket Nos. 307-71 at 1-2; 336-1 at 58-60 ¶ 166).

182. On June 1, 2018, Darden responded to Simasek, carbon-copying Darden, Wong, Kim, and others:

> Actify looks a little high. Puerto Rico brings them up in SoGA but the iPhone is not a good mover in PR and this handset is not Band 13 capable. I would eliminate Cellustar and take Actify down to 8.5%. Maybe spread the extra 1% amongst the big guys. Thank you [Simasek], you make all our lives better.

(Docket Nos. 307-72 at 1; 336-1 at 60 ¶ 167).

183. On June 1, 2018, Simasek replied: "Ok, thanks Darden. Gents – where do you want this extra to go to?" (Docket Nos. 307-72 at 1; 336-1 at 60 ¶ 167).

184. On June 1, 2018, Williams responded: "Break the balance between the [other] big 3 [Master Agents,]" which are neither Cellustar or

Civil No. 19-1559 (GMM)
Page -48-

Actify. (Docket Nos. 307-72 at 1; 336-1 at 60 ¶ 167).

185. On June 21, 2018, Cellustar's counsel Colberg emailed Sprint's counsel Andrews:

I am writing on behalf of my client, Cellustar, to report a problem with the supply of merchandise from Sprint and its appointed supplier, Ingram, which is Actify's parent company. Cellustar hereby requests Sprint to take immediate action to end this problem. Ingram and/or Sprint is rationing or stopping altogether the supply of several products to Cellustar and its Sprint dealers. Ingram and/or Sprint is particularly keen in preventing Cellustar and its dealers from purchasing the products that are being promoted by Sprint and/or are in high demand in Puerto Rico. In the meantime, these products are only made available to Ingram's subsidiary and Cellustar competitor, Actify, and its dealers in Puerto Rico. These actions are illegal and a breach of Sprint's obligations toward Cellustar. This situation has been affecting Cellustar and its dealers for some time. Cellustar urges Sprint to end this conduct immediately. Sprint must provide Cellustar and Actify exactly the same opportunity to purchase inventory from Sprint. For example, yesterday afternoon, Ricardo Esterrich one of PR Wireless's executives (subsidiary of Sprint) asked Cellustar to provide inventory information for specific models that are being promoted by Sprint. He was surprised to find out that Ingram/Sprint had not made these products available to Cellustar and its dealers. Below are specific examples of purchase orders for products that are either in promotion or in high demand that were not

Civil No. 19-1559 (GMM)
Page -49-

> available to Cellustar and were available to Actify.

(Docket Nos. 307-73 at 1; 336-1 at 60-61 ¶ 168).

186. On June 25, 2018, Eaves emailed Reyes, carbon-copying Palomino and other PR Wireless officials:

> Please let me know what is the level of inventory on all of your dealer doors for the LG X charge. This device will have a good promotion in July and we are going to promote the same. This next month of July we have an aggressive quota of 4,500 activations for all of your doors. We expect for the LG X charge to be around 30% of the weight.

(Docket No. 307-74 at 3-4; 320-1 at 60 ¶ 169).

187. On June 25, 2018, Reyes responded:

> As discussed in a conference call today, here I send you an example of the last allocation requested and assigned to CELLUSTAR. Specifically, the model that you ask, the LG X Charge, were [sic] requested 400 units and none were assigned. In addition, the allocation template in general has about 2689 units to which only assigned 1381 to CELLUSTAR. This represents approximately 50% of the units requested in the template. In addition to what was requested in the template, a note was included in which 2100 additional units of other models in promotion were required to those previously mentioned. In total were requested 4789 units to which only 1408 were assigned. This represent[s] approximately a 30% of the requested allocation. Cellustar requires a prompt action to that situation since, it is one which we have confronted in the past and

Civil No. 19-1559 (GMM)
Page -50-

we continue confronting. This clearly affects us in order to comply with quotas, requirements, etc. Include are evidence of the aforementioned. We hope this situation can be resolved as soon as possible.

(Docket Nos. 307-74 at 3; 336-1 at 61-62 ¶ 170).

188. On June 25, 2018, Sprint's Mosbauer emailed Reyes, carbon-copying Rosario, Eaves, Palomino, Colberg, and Andrews:

Different devices rotate in and out of being under constraint rules every week, and when a device is indeed constrained and only limited quantities are available, complete asks are not filled for any DDP. Zero (0) LG X-Charge devices were allocated on Sunday for Monday ordering/distribution to any DDP against an ask of 29,970. If there are no restrictions from a supply point of view, we fill all DDP asks without modification. If modification must occur, restrictions are placed across ALL DDP accounts, not just specific partners. We had 10 constrained devices this week, and all DDPs had modifications made to their orders.

(Docket Nos. 307-74 at 2-3; 336-1 at 61-62 ¶ 170).

189. On July 2, 2018, Reyes emailed Rosario, carbon-copying Eaves, Mosbauer, Williams, Andrews, Darden, Herman Colberg, and Palomino:

As discussed today in conference call, this is the situation that we continue to go through. As you can see, in the reply of Mr. Mosbauer, he notified us that weekly there are models that are restricted. Last week, before submitting our allocation, specifically on

Civil No. 19-1559 (GMM)
Page -51-

Wednesday, June 27 in the morning, an email was sent to Mr. Mosbauer asking him which models were restricted. Attached is a screenshot of the reply of Mr. Mosbauer which indicates [] the restricted models. . . . An allocation of 4491 units was carried out and only 1508 units were given, which represents less than 35% of what was requested. Again, the availability of the LG X Charge model which will be within its most aggressive promotions was discussed in our conference call. From this model we requested 900 units and they only assigned us 128 this week. Attached evidence of allocation. We have experienced this situation constantly, for example; the ZTE Max XL in which during the last month, it was all month in promotion and this promotion ends on July 16. During all that period we were assigned very little in some occasions and in most of them none. It is not now that when the promotion finally ends there will be availability of this model for Cellustar to order. Like this there are many examples. It should be noted that this model was available to customers who are not from CELLUSTAR. Again, we want to remind you that this affects us in our junk percentage, in our sales quotas and in all other metrics for which SPG measure us. In addition, this situation is creating an annoyance to our customers as they enter into a competitive disadvantage and its production affects them. We thank you for your action on this matter since it is one of high importance.

(Docket No. 307-74 at 1-2).

190. On July 9, 2018, Mosbauer responded:

As I have explained before. No process has changed. We allocate 100% of your ask

Civil No. 19-1559 (GMM)
Page -52-

> if we have full availability of the handset and it's not constrained. In the event we have less supply than demand the product becomes constrained and all DDPs get less than their demand or ask. In some cases we don't have any of the particular unit that was requested on a certain week which results in zero allocated. Again this is supply and demand and is in no way Sprint holding back units. We need to sell as many as possible and wish we always had the supply to meet demand but we have to navigate OEM receipts and our own short receipts vs asks. Look forward to having a call later this week to again discuss.

> (Docket Nos. 307-74 at 1; 336-1 at 64 ¶ 178).

191. On September 21, 2018, Simasek direct-messaged Barry Dolan ("Dolan"), among other topics, the following: "they [Cellustar] make me crazy"; "yea, they have an attorney so now they're louder than normal"; and "Thank you - i just got off the phone with the NAM [National Account Managers] - they are deliberating waiting to the last second to play the game with their attorney." (Docket Nos. 307-75 at 1-2; 336-1 at 62 ¶¶ 171-72).

192. On September 21, 2018, Dolan responded to Simasek, among other topics: "Just a FYI - If we reallocate their units, we'll probably have to make changes to the allocations for next week." (Docket Nos. 307-75 at 2; 336-1 at 62 ¶ 172).

193. On December 17, 2018, Reyes emailed Eaves, carbon-copying Palomino and other Sprint officials:

> As requested, I am including a very recent example of the allocations during the strongest sales season of the year in terms of highly promoted equipment. 600 Units of the SAMSUNG J7 REFINE model were

Civil No. 19-1559 (GMM)
Page -53-

ordered last week, and only 9 were allocated to be distributed to all our [Cellustar] stores. It is of utmost importance that this issue be resolved to meet sales targets, etc. It is worth mentioning that last week a box of equipment from a customer at one of Actify's stores, which contained 15 units of said model, arrived by mistake at our offices. I look forward to hearing from you.

(Docket Nos. 315-13 at 2; 336-1 at 62-63 ¶ 173).

194. On December 24, 2018, Reyes replied to his previous email:

Attached is the most recent evidence of the allocations for this week. 650 units of the SAMSUNG J7 REFINE model were ordered last week, and only 37 were allocated to be distributed to all our stores, which is less than 6% of what was requested. It should be noted that this model is currently under aggressive promotion and that this is not the first time this situation has occurred. I'm looking forward to your prompt response.

(Docket Nos. 315-13 at 1; 320-1 at 61 ¶ 173).

195. On December 24, 2018, Eaves responded: "It is my understanding that [Mosbauer] has explained several times the allocation process for inventory. I defer[] the same to him." (Id.; 320-1 at 61 ¶ 174).

196. On July 12, 2019, Sprint allocated to Cellustar 16 of the 250 LG Stylo 4 cellular phones and 43 of the 200 Coolpad Legacy cellular phones that were ordered. Sprint allocated 5 Coolpad Legacy cellular phones to one Actify retail store. (Docket Nos. 307-79; 336-1 at 63 ¶ 175).

Civil No. 19-1559 (GMM)
Page -54-

197. On or around May 15, 2020, Cellustar received between 1% to 25% of the order it placed for certain cellular phones that were listed by Sprint as being "open" or "moderate" constraint during a one- to two-week window, and during a three- to six-week window. Of the requested 950 LG K51' cellular phones, Sprint allocated 44; of the requested 100 Coolpad Legacy cellular phones, Sprint allocated 11; of the requested 150 Samsung A20 cellular phones, Sprint allocated 38. (Docket Nos. 307-2 at 15 ¶ 108; 307-81; 307-83 at 1-3; 336-1 at 63-64 ¶¶ 176-77).

198. On May 15, 2020, Cellustar, by way of its counsel Colberg, emailed Sprint's and PR Wireless' counsel:

> I am reaching out to you about new examples of unequal treatment and unexplained inventory restrictions on phone promotions. First, as a result of the COVID-19 measu[r]es taken by the PR Government . . . Sprint determined which stores would open and allowed Cellustar to open 3 of the allowed 19 stores; the other 16 went to Actify. After Adolfo Reyes complained about his unequal treatment, Cellustar was afforded the opportunity to open 3 additional stores . . . . We hereby ask for an explanation of Sprint's aforementioned decision to restrict Cellustar to 3 stores out of 19 within the next three (3) business days. Second, the LG K51 model (promotion enclosed) was not constrained pursuant to Sprint's enclosed presentation from May 3, 2020. It was classified as "Open" 1-2 weeks and "Moderate" in 3-6 weeks. However, Cellustar asked for 400 units of this model on May 6, 2020 and on May 8, 2020, Sprint only allocated 38 units. Given Sprint's past representations alleging equal treatment between Mas in terms of inventory restrictions, we hereby request that Sprint provide within

Civil No. 19-1559 (GMM)
Page -55-

> the next 3 business days the information on all "requests" made by and "allocations" given to all MAs on the LG K51 on or after March 1, 2020 to today. This information includes, but is not limited to, Actify's requests and allocations for Puerto Rico for this model. We also request, as we did in the past, that going forward all allocations and requests be shared with Cellustar and all MAs to make sure phone distribution is treated equally.

(Docket No. 307-83 at 2-3).

199. On May 15, 2020, Cellustar's counsel replied to its previous email:

> I am enclosing today's allocations for your review as well. The situation this time is:
> 1- LG K51: requested 550 – allocated 6
> 2- Coolpad Legacy: requested 100 – allocated 11 (this one was also branded as "open")
> 3- Samsung A20: requested 150 – allocated 38 (this one was branded as "moderate")
> Cellustar already has on backorder:
>    Samsung A20 = 172 boxes
>    LG K51 = 235 boxes
> As with other inventory constraints in the past, Cellustar's retailers are becoming angry that they do not have available the phones in promotion and their highest selling items. Cellustar does not have any explanation for these constraints, particularly considering that the K51 is a new model. Therefore, please also provide within the next 3 business days the information on all "requests" made by and "allocations" given to all MAs on the LG K51, Coolpad Legacy and A20 on or after March 1, 2020 to today. This information includes, but is not limited to, Actify's requests and allocations for Puerto Rico for these

Civil No. 19-1559 (GMM)
Page -56-

> model[s]. We reiterate Cellustar's request that going forward all allocations and requests be shared with Cellustar and all MAs to make sure phone distribution is treated equally.

(Id. at 1-2).

200. Actify did not receive from Sprint all of the inventory that it requested. (Docket Nos. 305-24 at 17; 322-1 at 15 ¶ 58).

201. Cellustar received approximately 16% of the cellular phones it requested; Actify received approximately 40% of the cellular phones it requested. (Docket Nos. 307-2 at 16 ¶¶ 111-12; 307-85 at 7; 320-1 at 64 ¶ 181; 336-1 at 65 ¶ 180).

F.    Geographic restrictions

202. The 2011 Agreement states that:

> Supplier may determine, in its sole discretion, that not all geographic areas and store locations of Master Agent's Retailers will be approved as Authorized Locations. The Supplier does not make any representation or warranties that the facilities of other Master Agents or retailers, or the facilities used by any of Supplier's own sales forces, will not be in the same geographic proximity as Master Agent or the Authorized Locations. Master Agent is not authorized to sell Products at or from any other location or by any other means (including soliciting sales over the Internet), without the express prior written approval of the Supplier.

(Docket Nos. 320-3 at 19 ¶ 17; 322-1 at 24 ¶ 97).

203. The 2013, 2014, and 2017 Agreements state:

Civil No. 19-1559 (GMM)
Page -57-

> Supplier may determine, in its sole discretion, that not all geographic areas and store locations of Master Agent's Retailers will be approved as Authorized Locations. The Supplier does not make any representation or warranties that the locations of other Master Agents or retailers, or the locations used by any of Supplier's own sales force, will not be in the same geographic proximity as Master Agent or the Authorized Locations. Master Agent is not authorized to sell Products at or from another location or by any other means (including soliciting sales over the Internet), without the express prior written approval of the Supplier.
>
> (Docket Nos. 305-9 at 23 ¶ 19; 305-10 at 23 ¶ 19; 305-18 at 24 ¶ 19; 322-1 at 24 ¶ 97).

204. Certain Open Mobile stores that transitioned into Boost Mobile stores were located in the proximity of already-existing Boost Mobile stores. (Docket Nos. 305-44 at 38-39 ¶ 70; 322-1 at 24 ¶ 96).

## IV.  APPLICABLE LAW AND ANALYSIS

A.    Section 2(a) of the Robinson-Patman Act

Cellustar contends that Defendants engaged in unlawful price discrimination in violation of Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), in two respects: (1) by charging Cellustar shipping costs that were not imposed on Actify; and (2) by denying Cellustar the ability to select its preferred shipping carrier. (Docket No. 307 at 23-26).

The Robinson-Patman Act prohibits price discrimination between purchasers of commodities of like grade and quality "where

Civil No. 19-1559 (GMM)
Page -58-

the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly." The Shell Co. (P.R.) Ltd. v. Los Frailes Serv. Station, 551 F. Supp. 2d 127, 132-33 (D.P.R. 2007), aff'd, 605 F.3d 10 (1st Cir. 2010); see 15 U.S.C. § 13(a). However, the statute "does not ban all price differences," but only those that threaten competitive injury. See Brooke Grp. Ltd., 509 U.S. at 220.Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.; Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc., 546 U.S. 164 (2006).

To establish a prima facie case under Section 2(a), a plaintiff must show: (1) contemporaneous sales by the same seller to different purchasers; (2) at different prices; (3) of products of like grade and quality; (4) in interstate commerce; (5) that the price discrimination had a reasonable possibility of harming competition; and (6) caused injury to the plaintiff. Shell Co., 551 F. Supp. 2d at 133 (quoting Walpa Constr. Corp. v. Mobile Paint Mfg. Co., 701 F. Supp. 23, 27 (D.P.R. 1988)).

Failure to establish either a cognizable price differential or competitive injury is fatal to a Section 2(a) claim.

1.    Shipping Costs

Cellustar argues that Sprint effectively increased the price of its products by adding shipping costs to its invoices, while not imposing similar charges on Actify. (Docket No. 307 at 21-26).

Civil No. 19-1559 (GMM)
Page -59-

Sprint responds that this differential reflects distinct delivery arrangements - one dealer paying for delivery while the other handled shipping independently - and therefore corresponds to different service-related costs. (Docket No. 305 at 19-20).

Reviewing the elements of a Section 2(a) claim, it is uncontested that the first, third, and fourth elements are met: Sprint made contemporaneous sales via interstate commerce of cellular phones to Actify and Cellustar. The record further reflects that, prior to 2014, Cellustar was not charged shipping costs, but that such charges were subsequently imposed, thereby increasing the total price paid by Cellustar relative to Actify. (Section III ¶¶ 41-42). *See* Fed. Trade Comm'n v. Cement Inst., 333 U.S. 683, 724 (1948) (recognizing freight charges as part of price for purposes of Section 2(a)).

Section 2(a), however, expressly permits "differentials which make only due allowance for differences in the cost of . . . delivery resulting from the differing methods." 15 U.S.C. § 13(a). Accordingly, price differences attributable to legitimate variations in delivery methods fall within the statute's cost-justification framework and do not, without more, satisfy the requirement of a substantial lessening of competition.

Civil No. 19-1559 (GMM)
Page -60-

Even assuming arguendo that the challenged charges could constitute a price differential, Plaintiff's claim fails for two reasons.

First, the record does not establish a cognizable price discrimination within the meaning of Section 2(a)'s fifth element. The differential reflects materially different logistical arrangements rather than a price concession between competing purchasers. Cellustar relied on third-party coordination through Ingram to transport inventory from Sprint's warehouse in Plainfield, Indiana to Puerto Rico, generating freight expenses that Sprint passed through. By contrast, Actify, an entity integrated with Ingram, utilized its parent company's internal logistics infrastructure, eliminating the need for comparable third-party freight services at the point of sale. On this record, the difference reflects a distinction in cost-bearing structure, not discriminatory pricing. *Supra* (Section III ¶¶ 34-40).[4]

Second, Plaintiff has failed to demonstrate competitive injury. The record contains no evidence that the challenged shipping charges resulted in lost sales, reduced margins relative

---

[4] While the parties' agreements confirm that Cellustar assumed responsibility for transportation charges, (Docket Nos. 305-9 at 17 ¶ 8(a)(1); 305-10 at 17 ¶ 8(a)(1); 305-18 at 17-18 ¶ 8(a)(1)), contractual allocation of costs does not, by itself, resolve liability under the Robinson-Patman Act. The Court considers those agreements only as part of the factual context informing whether the price differential reflects a legitimate cost-based distinction.

Civil No. 19-1559 (GMM)
Page -61-

to Actify, or displacement in the relevant market. Absent such evidence, the alleged differential does not satisfy the sixth element's injury requirement under Section 2(a).

Accordingly, because the challenged differential reflects permissible differences in delivery costs and is unsupported by evidence of competitive injury, Plaintiff has failed to establish a violation of Section 2(a) as to shipping charges.

2.    Shipping Carrier

Cellustar also contends that Defendants engaged in price discrimination by denying it the ability to select its preferred shipping carrier. To establish a prima facie case, Plaintiff must demonstrate not only differential treatment, but that such treatment resulted in a price difference and caused competitive injury. Shell Co., 551 F. Supp. 2d at 133. Differential treatment in ancillary business arrangements, without a corresponding effect on net price, does not constitute price discrimination under Section 2(a).

Here, Cellustar merely inquired whether it could select a different carrier, without presenting evidence that alternative carriers would have resulted in lower shipping costs, or that such lower costs were available to Cellustar under comparable conditions. *Supra* (Section III ¶¶ 52-54).

Civil No. 19-1559 (GMM)
Page -62-

Nor does the record reflect that Defendants' alleged restriction was arbitrary or designed to disadvantage Plaintiff competitively. The "Robinson-Patman does not 'ban all price differences charged to different purchasers of commodities of like grade and quality.'" Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc., 546 U.S. 164, 176 (2006) (*citing* Brooke Group Ltd., 509 U.S. at 220).

Absent evidence that the challenged conduct resulted in a higher net price relative to a competing purchaser, Plaintiff cannot establish a cognizable price differential. As such, Plaintiff's claim as to the selection of shipping carrier "reflect cost differences, fluctuating market conditions, or bona fide attempts to meet competition[,]" without "tend[ing] to lessen substantially competition or create a monopoly in any line of commerce[.]" Automatic Canteen Co. of Am. v. Fed. Trade Comm'n, 346 U.S. 61, 71 (1953).[5]

A restriction on carrier selection, without evidence that it resulted in a higher net price relative to a competing purchaser, does not constitute price discrimination within the meaning of Section 2(a). Moreover, the record reflects that Cellustar and

---

[5] Law 75 establishes a presumption of impairment and unjust termination "when the principal or grantor unilaterally and in an unreasonable manner varies the shipping methods or the manner, conditions or terms of payment for the merchandise ordered, to the prejudice of the dealer." P.R. Laws Ann. tit. 10, § 278a-1(b)(4). The Court currently does not issue an opinion as to Law 75 claims.

Civil No. 19-1559 (GMM)
Page -63-

Actify operated under materially different logistical frameworks, and the selection of a carrier was tied to those operational differences rather than to any effort to disadvantage Plaintiff competitively. Plaintiff has likewise failed to demonstrate competitive injury arising from this practice. Accordingly, Cellustar has failed to demonstrate either a cognizable price differential or competitive injury arising from Defendants' shipping carrier practices.

B.    Sections 2(d)-(e) of the Robinson-Patman Act

Having concluded that Plaintiff has failed to establish a violation of Section 2(a), the Court turns to Cellustar's remaining claims under Sections 2(d) and 2(e) of the Robinson-Patman Act, which address a distinct category of conduct — namely, the provision of promotional allowances or services to competing purchasers. Cellustar alleges that Defendants violated these provisions by allocating more constrained inventory to Actify. (Docket No. 307 at 27-38).

Sections 2(d) and 2(e) prohibit a seller from granting promotional allowances or services to some purchasers unless such benefits are made available to all competing purchasers on proportionally equal terms. *See* 15 U.S.C. § 13(d)-(e); Fed. Trade Comm'n v. Fred Meyer, Inc., 390 U.S. 341, 348, 350-51 (1968); *see also* George Haug Co. v. Rolls Royce Motor Cars, 148 F.3d 136, 144-

Civil No. 19-1559 (GMM)
Page -64-

45 (2nd Cir. 1998); Exquisite Form Brassiere, Inc. v. Fed. Trade Comm'n, 301 F.2d 499, 500 (D.C. Cir. 1961); Rickles, Inc. v. Frances Denney Corp., 508 F. Supp. 4, 6 (D. Mass. 1980). These provisions are narrowly directed at discriminatory promotional assistance, such as advertising allowances or merchandising services, not disparities in the underlying product itself.

Here, Cellustar does not identify any promotional payments, advertising allowances, or merchandising services provided to Actify but denied to Cellustar. Instead, Plaintiff challenges disparities in the allocation of constrained inventory. (Docket No. 307 at 31).

That distinction is dispositive. Even assuming that Actify received proportionally greater inventory during periods of limited supply, such conduct concerns product availability, not the provision of promotional services or facilities within the meaning of Sections 2(d) and 2(e). The statute does not impose a general obligation on suppliers to allocate scarce inventory equally among competing purchasers, even where such disparities may have downstream commercial effects. Indeed, consistent with that principle, courts have repeatedly held that disparities in the allocation of high-demand or limited-supply products fall outside the scope of Sections 2(d) and 2(e), because inventory is not a "service or facility" connected to resale—it is the product

Civil No. 19-1559 (GMM)
Page -65-

itself. *See, e.g.,* David R. McGeorge Car Co. v. Leyland Motor Sales, Inc., 504 F.2d 52, 53-54 (4th Cir. 1974) (holding that disparities in the allocation of a high-demand, short-supply commodity among dealers does not fall within the scope of Section 2(e)); Cecil Corley Motor Co. v. General Motors Corp., 380 F. Supp. 819, 848 (M.D. Tenn. 1974) (holding that the allocation of inventory "is not within the purview" of Section 2(e)); Carlo C. Gelardi Corp. v. Miller Brewing Co., 502 F. Supp. 637, 649-50 (D.N.J. 1980) (challenging "an allocation system" that is "employed in a discriminatory manner" is "discrimination in supply and willingness to sell[, i]t is not a discrimination in 'services or facilities' and is not, therefore, illegal under § 13(e)").

Construing Sections 2(d) and 2(e) to encompass disparities in inventory allocation would improperly transform the Robinson-Patman Act into a general fairness statute governing all aspects of supplier-distributor relationships, a result routinely rejected by federal courts. *See* id.

Plaintiff's attempts to characterize other aspects of its relationship with Defendants as "promotional services" are likewise unavailing. Cellustar points to "the offering of former Open Mobile retailers to Actify" as an example of unequal promotional assistance. (Docket No. 95 ¶¶ 53, 115). However, the extension of a retailer relationship to a Master Agent does not

Civil No. 19-1559 (GMM)
Page -66-

constitute a promotional "service" or "facility" within the meaning of Sections 2(d) and 2(e). Nor does the record support Plaintiff's suggestion or broader assertion that Defendants provided promotional support to Actify that was denied to Cellustar.

At bottom, Plaintiff's theory rests on the premise that it was unable to take equal advantage of promotional opportunities because the SOGA allocation formula resulted in Actify receiving a greater share of constrained inventory. (Docket Nos. 307 at 27-40; 322 at 13-18; 336 at 22-31). But Sections 2(d) and 2(e) do not guarantee equal commercial outcomes or equal access to inventory; they require only that promotional programs themselves be made available on proportionally equal terms. Federal courts have consistently rejected attempts to recast disparities in product availability as violations of Sections 2(d) and 2(e), even where such disparities may affect a distributor's ability to compete. *C.f.* Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1423-24 (11th Cir. 1990).

The paradigm violation of these provisions arises where a purchaser is effectively foreclosed from participating in promotional programs altogether. Id. [6] That is not the case here.

---

[6] Law 75 establishes a presumption of impairment and unjust termination "when the principal or grantor unjustifiably refuses or fails to fill the order for

Civil No. 19-1559 (GMM)
Page -67-

Accordingly, Plaintiff's claims under Sections 2(d) and 2(e) fail as a matter of law.

## C.    The Puerto Rico Anti-Monopoly Act

"In Puerto Rico, price discrimination is proscribed by P.R. Laws Ann. tit. 10 § 263, which reads the same as the Robinson Patman Act, except that the Puerto Rico law does not include the Robinson Patman Act's requirement that at least one of the transactions must occur in interstate commerce." Shell Co., 551 F. Supp. 2d at 135.

Because the Puerto Rico statute is materially identical to its federal counterpart, the foregoing analysis applies with equal force. Accordingly, Plaintiff's claims under P.R. Laws Ann. tit. 10, §§ 263-64 also fail as a matter of law and shall also be dismissed.

## D.    Supplemental Jurisdiction

"Federal courts are courts of limited jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994); *see* U.S. Const., Art. III, Cl. 2. This civil action was removed on the

---

merchandise sent to him by the dealer in reasonable amounts and within a reasonable time" and "when the principal or grantor establishes a distribution relationship with one or more additional dealers for the area of Puerto Rico or any part of said area in conflict with the contract existing between the parties." P.R. Laws Ann. tit. 10, § 278a-1(b)(2)-(3). The Court currently does not issue an opinion as to Law 75 and defers its decision to address these claims after holding a hearing on this matter. *Infra* (Section IV.D).

Civil No. 19-1559 (GMM)
Page -68-

basis of federal question jurisdiction. Having disposed of all federal claims, the Court retains discretion to exercise supplemental jurisdiction over the remaining state law claims. *See* City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 173 (1997).[7]

In light of considerations of judicial economy, convenience, fairness, and comity, the Court defers ruling on whether to exercise supplemental jurisdiction. The parties are hereby ORDERED to appear for a hearing to address whether the Court should retain jurisdiction over the remaining state law claims.

## V.    CONCLUSION

For the reasons explained above, *Defendants' Motion for Summary Judgment* is **GRANTED IN PART** as to the claims brought under the Robinson-Patman Act and the Puerto Rico Anti-Monopoly Act and *Plaintiff's Motion for Partial Summary Judgment* is **DENIED IN PART** as to the claims under those statutes. Accordingly, those claims

---

[7] Sprint posits that diversity jurisdiction should exist, had it not been that Cellustar "fraudulently joined" PR Wireless as a defendant "only to avoid this Court's jurisdiction." This argument is facially frivolous. (Docket No. 1 at 3 ¶ 9). Taking into account the undisputed fact that the Boost Mobile joint venture in question - from which all the operative facts arise - was operated by PR Wireless, *supra* (Section (III ¶¶ 4, 8), it becomes clear that PR Wireless is an indispensable party in this civil action; the sought relief would not be complete without PR Wireless' joinder. Fed. R. Civ. P. 19(a)(1)(A); Jiménez v. Rodríguez-Pagán, 597 F.3d 18, 24-25 (1st Cir. 2010). Accordingly, this Court does not retain diversity jurisdiction, because Plaintiff Cellustar is incorporated in the laws of Puerto Rico, with its principal place of business in Puerto Rico; whereas Defendant PR Wireless, although incorporated in Delaware, has its principal place of business in Puerto Rico. 28 U.S.C. s 1332(c)(1)(C); BNSF Ry. Co. v. Tyrrell, 581 U.S. 402 (2017).

Civil No. 19-1559 (GMM)
Page -69-

are dismissed. A hearing to address supplemental jurisdiction as to the remaining state claims shall be scheduled forthwith.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this March 31, 2026.

/s/ Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE